Justice KENNEDY delivered the opinion of the Court.
*749 Two women then resident in New York were married in a lawful ceremony in Ontario, Canada, in 2007. Edith Windsor *750 and Thea Spyer returned to their home in New York City. When Spyer died in 2009, she left her entire estate to Windsor. Windsor sought to claim the estate tax exemption for surviving spouses. She was barred from doing so, *751 however, by a federal law, the Defense of Marriage Act, which excludes a same-sex partner from the definition of "spouse" as that term is used in federal statutes. Windsor paid the taxes but filed suit to challenge the constitutionality of this provision. The United States District Court and the Court of Appeals ruled that this portion of the statute is *752 unconstitutional and ordered the United States to pay Windsor a refund. This Court granted certiorari and now affirms the judgment in Windsor's favor.
I
In 1996, as some States were beginning to consider the concept of same-sex marriage, see, e.g., Baehr v. Lewin, 74 Haw. 530, 852 P.2d 44 (1993), and before any State had acted to permit it, Congress enacted the Defense of Marriage Act (DOMA), 110 Stat. 2419. DOMA contains two operative sections: Section 2, which has not been challenged here, allows States to refuse to recognize same-sex *2683 marriages performed under the laws of other States. See 28 U.S.C. § 1738C.
Section 3 is at issue here. It amends the Dictionary Act in Title 1, § 7, of the United States Code to provide a federal definition of "marriage" and "spouse." Section 3 of DOMA provides as follows:
"In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife." 1 U.S.C. § 7.
The definitional provision does not by its terms forbid States from enacting laws permitting same-sex marriages or civil unions or providing state benefits to residents in that status. The enactment's comprehensive definition of marriage for purposes of all federal statutes and other regulations or directives covered by its terms, however, does control over 1,000 federal laws in which marital or spousal status is addressed as a matter of federal law. See GAO, D. Shah, Defense of Marriage Act: Update to Prior Report 1 (GAO-04-353R, 2004).
*753 Edith Windsor and Thea Spyer met in New York City in 1963 and began a long-term relationship. Windsor and Spyer registered as domestic partners when New York City gave that right to same-sex couples in 1993. Concerned about Spyer's health, the couple made the 2007 trip to Canada for their marriage, but they continued to reside in New York City. The State of New York deems their Ontario marriage to be a valid one. See 699 F.3d 169, 177-178 (C.A.2 2012).
Spyer died in February 2009, and left her entire estate to Windsor. Because DOMA denies federal recognition to same-sex spouses, Windsor did not qualify for the marital exemption from the federal estate tax, which excludes from taxation "any interest in property which passes or has passed from the decedent to his surviving spouse." 26 U.S.C. § 2056(a). Windsor paid $363,053 in estate taxes and sought a refund. The Internal Revenue Service denied the refund, concluding that, under DOMA, Windsor was not a "surviving spouse." Windsor commenced this refund suit in the United States District Court for the Southern District of New York. She contended that DOMA violates the guarantee of equal protection, as applied to the Federal Government through the Fifth Amendment.
While the tax refund suit was pending, the Attorney General of the United States notified the Speaker of the House of Representatives, pursuant to 28 U.S.C. § 530D, that the Department of Justice would no longer defend the constitutionality of DOMA's § 3. Noting that "the Department has previously defended DOMA against ... challenges involving legally married same-sex couples," App. 184, the Attorney General informed Congress that "the President has concluded that given a number of factors, including a documented history of discrimination, classifications based on sexual orientation should be subject to a heightened standard of scrutiny." Id., at 191. The Department of Justice has submitted many § 530D letters over the years refusing to *754 defend laws it deems unconstitutional, when, for instance, a federal court has rejected the Government's defense of a statute and has issued a judgment against it. This case is unusual, however, because the § 530D letter was not preceded by an adverse judgment. The letter instead reflected the Executive's own conclusion, relying on a definition still being debated and considered in the courts, that heightened equal protection *2684 scrutiny should apply to laws that classify on the basis of sexual orientation.
Although "the President ... instructed the Department not to defend the statute in Windsor, " he also decided "that Section 3 will continue to be enforced by the Executive Branch" and that the United States had an "interest in providing Congress a full and fair opportunity to participate in the litigation of those cases." Id., at 191-193. The stated rationale for this dual-track procedure (determination of unconstitutionality coupled with ongoing enforcement) was to "recogniz[e] the judiciary as the final arbiter of the constitutional claims raised." Id., at 192.
In response to the notice from the Attorney General, the Bipartisan Legal Advisory Group (BLAG) of the House of Representatives voted to intervene in the litigation to defend the constitutionality of § 3 of DOMA. The Department of Justice did not oppose limited intervention by BLAG. The District Court denied BLAG's motion to enter the suit as of right, on the rationale that the United States already was represented by the Department of Justice. The District Court, however, did grant intervention by BLAG as an interested party. See Fed. Rule Civ. Proc. 24(a)(2).
On the merits of the tax refund suit, the District Court ruled against the United States. It held that § 3 of DOMA is unconstitutional and ordered the Treasury to refund the tax with interest. Both the Justice Department and BLAG filed notices of appeal, and the Solicitor General filed a petition for certiorari before judgment. Before this Court acted on the petition, the Court of Appeals for the Second Circuit *755 affirmed the District Court's judgment. It applied heightened scrutiny to classifications based on sexual orientation, as both the Department and Windsor had urged. The United States has not complied with the judgment. Windsor has not received her refund, and the Executive Branch continues to enforce § 3 of DOMA.
In granting certiorari on the question of the constitutionality of § 3 of DOMA, the Court requested argument on two additional questions: whether the United States' agreement with Windsor's legal position precludes further review and whether BLAG has standing to appeal the case. All parties agree that the Court has jurisdiction to decide this case; and, with the case in that framework, the Court appointed Professor Vicki Jackson as amicus curiae to argue the position that the Court lacks jurisdiction to hear the dispute. 568 U.S. ----, 133 S.Ct. 786, 184 L.Ed.2d 527 (2012). She has ably discharged her duties.
In an unrelated case, the United States Court of Appeals for the First Circuit has also held § 3 of DOMA to be unconstitutional. A petition for certiorari has been filed in that case. Pet. for Cert. in Bipartisan Legal Advisory Group v. Gill, O.T. 2012, No. 12-13.
II
It is appropriate to begin by addressing whether either the Government or BLAG, or both of them, were entitled to appeal to the Court of Appeals and later to seek certiorari and appear as parties here.
There is no dispute that when this case was in the District Court it presented a concrete disagreement between opposing parties, a dispute suitable for judicial resolution. "[A] taxpayer has standing to challenge the collection of a specific tax assessment as unconstitutional; being forced to pay such a tax causes a real and immediate economic injury to the individual taxpayer." Hein v. Freedom From Religion Foundation, Inc., 551 U.S. 587, 599, 127 S.Ct. 2553, 168 L.Ed.2d 424 (2007) (plurality *2685 opinion) (emphasis deleted). Windsor suffered a redressable injury *756 when she was required to pay estate taxes from which, in her view, she was exempt but for the alleged invalidity of § 3 of DOMA.
The decision of the Executive not to defend the constitutionality of § 3 in court while continuing to deny refunds and to assess deficiencies does introduce a complication. Even though the Executive's current position was announced before the District Court entered its judgment, the Government's agreement with Windsor's position would not have deprived the District Court of jurisdiction to entertain and resolve the refund suit; for her injury (failure to obtain a refund allegedly required by law) was concrete, persisting, and unredressed. The Government's position-agreeing with Windsor's legal contention but refusing to give it effect-meant that there was a justiciable controversy between the parties, despite what the claimant would find to be an inconsistency in that stance. Windsor, the Government, BLAG, and the amicus appear to agree upon that point. The disagreement is over the standing of the parties, or aspiring parties, to take an appeal in the Court of Appeals and to appear as parties in further proceedings in this Court.
The amicus' position is that, given the Government's concession that § 3 is unconstitutional, once the District Court ordered the refund the case should have ended; and the amicus argues the Court of Appeals should have dismissed the appeal. The amicus submits that once the President agreed with Windsor's legal position and the District Court issued its judgment, the parties were no longer adverse. From this standpoint the United States was a prevailing party below, just as Windsor was. Accordingly, the amicus reasons, it is inappropriate for this Court to grant certiorari and proceed to rule on the merits; for the United States seeks no redress from the judgment entered against it.
This position, however, elides the distinction between two principles: the jurisdictional requirements of Article III and the prudential limits on its exercise. See *757 Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The latter are "essentially matters of judicial self-governance." Id., at 500, 95 S.Ct. 2197. The Court has kept these two strands separate: "Article III standing, which enforces the Constitution's case-or-controversy requirement, see Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ; and prudential standing, which embodies 'judicially self-imposed limits on the exercise of federal jurisdiction,' Allen [v. Wright, ] 468 U.S. [737,] 751, 104 S.Ct. 3315 [82 L.Ed.2d 556 (1984) ]." Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 11-12, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004).
The requirements of Article III standing are familiar:
"First, the plaintiff must have suffered an 'injury in fact'-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural or hypothetical." ' Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' "
*2686 Lujan, supra, at 560-561, 112 S.Ct. 2130 (footnote and citations omitted).
Rules of prudential standing, by contrast, are more flexible "rule[s] ... of federal appellate practice," Deposit Guaranty Nat. Bank v. Roper, 445 U.S. 326, 333, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980), designed to protect the courts from "decid[ing] abstract questions of wide public significance even [when] other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." Warth, supra, at 500, 95 S.Ct. 2197.
In this case the United States retains a stake sufficient to support Article III jurisdiction on appeal and in proceedings before this Court. The judgment in question orders the United States to pay Windsor the refund she seeks. An *758 order directing the Treasury to pay money is "a real and immediate economic injury," Hein, 551 U.S., at 599, 127 S.Ct. 2553, indeed as real and immediate as an order directing an individual to pay a tax. That the Executive may welcome this order to pay the refund if it is accompanied by the constitutional ruling it wants does not eliminate the injury to the national Treasury if payment is made, or to the taxpayer if it is not. The judgment orders the United States to pay money that it would not disburse but for the court's order. The Government of the United States has a valid legal argument that it is injured even if the Executive disagrees with § 3 of DOMA, which results in Windsor's liability for the tax. Windsor's ongoing claim for funds that the United States refuses to pay thus establishes a controversy sufficient for Article III jurisdiction. It would be a different case if the Executive had taken the further step of paying Windsor the refund to which she was entitled under the District Court's ruling.
This Court confronted a comparable case in INS v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). A statute by its terms allowed one House of Congress to order the Immigration and Naturalization Service (INS) to deport the respondent Chadha. There, as here, the Executive determined that the statute was unconstitutional, and "the INS presented the Executive's views on the constitutionality of the House action to the Court of Appeals." Id., at 930, 103 S.Ct. 2764. The INS, however, continued to abide by the statute, and "the INS brief to the Court of Appeals did not alter the agency's decision to comply with the House action ordering deportation of Chadha." Ibid. This Court held "that the INS was sufficiently aggrieved by the Court of Appeals decision prohibiting it from taking action it would otherwise take," ibid. , regardless of whether the agency welcomed the judgment. The necessity of a "case or controversy" to satisfy Article III was defined as a requirement that the Court's " 'decision will have real meaning: if we rule for Chadha, he will not be *759 deported; if we uphold [the statute], the INS will execute its order and deport him.' " Id., at 939-940, 103 S.Ct. 2764 (quoting Chadha v. INS, 634 F.2d 408, 419 (C.A.9 1980) ). This conclusion was not dictum. It was a necessary predicate to the Court's holding that "prior to Congress' intervention, there was adequate Art. III adverseness." 462 U.S., at 939, 103 S.Ct. 2764. The holdings of cases are instructive, and the words of Chadha make clear its holding that the refusal of the Executive to provide the relief sought suffices to preserve a justiciable dispute as required by Article III. In short, even where "the Government largely agree[s] with the opposing party on the merits of the controversy," there is sufficient adverseness and an "adequate basis for jurisdiction in the fact that the Government *2687 intended to enforce the challenged law against that party." Id., at 940, n. 12, 103 S.Ct. 2764.
It is true that "[a] party who receives all that he has sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it." Roper,supra, at 333, 100 S.Ct. 1166, see also Camreta v. Greene, 563 U.S. ----, ----, 131 S.Ct. 2020, 2030, 179 L.Ed.2d 1118 (2011) ( "As a matter of practice and prudence, we have generally declined to consider cases at the request of a prevailing party, even when the Constitution allowed us to do so"). But this rule "does not have its source in the jurisdictional limitations of Art. III. In an appropriate case, appeal may be permitted ... at the behest of the party who has prevailed on the merits, so long as that party retains a stake in the appeal satisfying the requirements of Art. III." Roper, supra, at 333-334, 100 S.Ct. 1166.
While these principles suffice to show that this case presents a justiciable controversy under Article III, the prudential problems inherent in the Executive's unusual position require some further discussion. The Executive's agreement with Windsor's legal argument raises the risk that instead of a " 'real, earnest and vital controversy,' " the Court faces a "friendly, non-adversary, proceeding ... [in which] 'a party beaten in the legislature [seeks to] transfer to the *760 courts an inquiry as to the constitutionality of the legislative act.' " Ashwander v. TVA, 297 U.S. 288, 346, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (quoting Chicago & Grand Trunk R. Co. v. Wellman, 143 U.S. 339, 345, 12 S.Ct. 400, 36 L.Ed. 176 (1892) ). Even when Article III permits the exercise of federal jurisdiction, prudential considerations demand that the Court insist upon "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).
There are, of course, reasons to hear a case and issue a ruling even when one party is reluctant to prevail in its position. Unlike Article III requirements-which must be satisfied by the parties before judicial consideration is appropriate-the relevant prudential factors that counsel against hearing this case are subject to "countervailing considerations [that] may outweigh the concerns underlying the usual reluctance to exert judicial power." Warth, 422 U.S., at 500-501, 95 S.Ct. 2197. One consideration is the extent to which adversarial presentation of the issues is assured by the participation of amici curiae prepared to defend with vigor the constitutionality of the legislative act. With respect to this prudential aspect of standing as well, the Chadha Court encountered a similar situation. It noted that "there may be prudential, as opposed to Art. III, concerns about sanctioning the adjudication of [this case] in the absence of any participant supporting the validity of [the statute]. The Court of Appeals properly dispelled any such concerns by inviting and accepting briefs from both Houses of Congress." 462 U.S., at 940, 103 S.Ct. 2764. Chadha was not an anomaly in this respect. The Court adopts the practice of entertaining arguments made by an amicus when the Solicitor General confesses error with respect to a judgment below, even if the confession is in effect an admission that an Act of Congress is unconstitutional. See, e.g., Dickerson v. United States, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).
*761 In the case now before the Court the attorneys for BLAG present a substantial argument for the constitutionality of § 3 of *2688 DOMA. BLAG's sharp adversarial presentation of the issues satisfies the prudential concerns that otherwise might counsel against hearing an appeal from a decision with which the principal parties agree. Were this Court to hold that prudential rules require it to dismiss the case, and, in consequence, that the Court of Appeals erred in failing to dismiss it as well, extensive litigation would ensue. The district courts in 94 districts throughout the Nation would be without precedential guidance not only in tax refund suits but also in cases involving the whole of DOMA's sweep involving over 1,000 federal statutes and a myriad of federal regulations. For instance, the opinion of the Court of Appeals for the First Circuit, addressing the validity of DOMA in a case involving regulations of the Department of Health and Human Services, likely would be vacated with instructions to dismiss, its ruling and guidance also then erased. See Massachusetts v. United States Dept. of Health and Human Servs., 682 F.3d 1 (C.A.1 2012). Rights and privileges of hundreds of thousands of persons would be adversely affected, pending a case in which all prudential concerns about justiciability are absent. That numerical prediction may not be certain, but it is certain that the cost in judicial resources and expense of litigation for all persons adversely affected would be immense. True, the very extent of DOMA's mandate means that at some point a case likely would arise without the prudential concerns raised here; but the costs, uncertainties, and alleged harm and injuries likely would continue for a time measured in years before the issue is resolved. In these unusual and urgent circumstances, the very term "prudential" counsels that it is a proper exercise of the Court's responsibility to take jurisdiction. For these reasons, the prudential and Article III requirements are met here; and, as a consequence, the Court need not decide whether BLAG would have standing to challenge the *762 District Court's ruling and its affirmance in the Court of Appeals on BLAG's own authority.
The Court's conclusion that this petition may be heard on the merits does not imply that no difficulties would ensue if this were a common practice in ordinary cases. The Executive's failure to defend the constitutionality of an Act of Congress based on a constitutional theory not yet established in judicial decisions has created a procedural dilemma. On the one hand, as noted, the Government's agreement with Windsor raises questions about the propriety of entertaining a suit in which it seeks affirmance of an order invalidating a federal law and ordering the United States to pay money. On the other hand, if the Executive's agreement with a plaintiff that a law is unconstitutional is enough to preclude judicial review, then the Supreme Court's primary role in determining the constitutionality of a law that has inflicted real injury on a plaintiff who has brought a justiciable legal claim would become only secondary to the President's. This would undermine the clear dictate of the separation-of-powers principle that "when an Act of Congress is alleged to conflict with the Constitution, '[i]t is emphatically the province and duty of the judicial department to say what the law is.' " Zivotofsky v. Clinton, 566 U.S. ----, ----, 132 S.Ct. 1421, 1427-1428, 182 L.Ed.2d 423 (2012) (quoting Marbury v. Madison, 1 Cranch 137, 177, 2 L.Ed. 60 (1803) ). Similarly, with respect to the legislative power, when Congress has passed a statute and a President has signed it, it poses grave challenges to the separation of powers for the Executive at a particular moment to be able to nullify Congress' enactment solely on its own initiative and without any determination from the Court.
*2689 The Court's jurisdictional holding, it must be underscored, does not mean the arguments for dismissing this dispute on prudential grounds lack substance. Yet the difficulty the Executive faces should be acknowledged. When the Executive makes a principled determination that a statute is unconstitutional, it faces a difficult choice. Still, there is no *763 suggestion here that it is appropriate for the Executive as a matter of course to challenge statutes in the judicial forum rather than making the case to Congress for their amendment or repeal. The integrity of the political process would be at risk if difficult constitutional issues were simply referred to the Court as a routine exercise. But this case is not routine. And the capable defense of the law by BLAG ensures that these prudential issues do not cloud the merits question, which is one of immediate importance to the Federal Government and to hundreds of thousands of persons. These circumstances support the Court's decision to proceed to the merits.
III
When at first Windsor and Spyer longed to marry, neither New York nor any other State granted them that right. After waiting some years, in 2007 they traveled to Ontario to be married there. It seems fair to conclude that, until recent years, many citizens had not even considered the possibility that two persons of the same sex might aspire to occupy the same status and dignity as that of a man and woman in lawful marriage. For marriage between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization. That belief, for many who long have held it, became even more urgent, more cherished when challenged. For others, however, came the beginnings of a new perspective, a new insight. Accordingly some States concluded that same-sex marriage ought to be given recognition and validity in the law for those same-sex couples who wish to define themselves by their commitment to each other. The limitation of lawful marriage to heterosexual couples, which for centuries had been deemed both necessary and fundamental, came to be seen in New York and certain other States as an unjust exclusion.
Slowly at first and then in rapid course, the laws of New York came to acknowledge the urgency of this issue for *764 same-sex couples who wanted to affirm their commitment to one another before their children, their family, their friends, and their community. And so New York recognized same-sex marriages performed elsewhere; and then it later amended its own marriage laws to permit same-sex marriage. New York, in common with, as of this writing, 11 other States and the District of Columbia, decided that same-sex couples should have the right to marry and so live with pride in themselves and their union and in a status of equality with all other married persons. After a statewide deliberative process that enabled its citizens to discuss and weigh arguments for and against same-sex marriage, New York acted to enlarge the definition of marriage to correct what its citizens and elected representatives perceived to be an injustice that they had not earlier known or understood. See Marriage Equality Act, 2011 N.Y. Laws 749 (codified at N.Y. Dom. Rel. Law Ann. §§ 10-a, 10-b, 13 (West 2013)).
Against this background of lawful same-sex marriage in some States, the design, purpose, and effect of DOMA should be considered as the beginning point in deciding whether it is valid under the Constitution. By history and tradition the definition and regulation of marriage, as will be discussed in more detail, has *2690 been treated as being within the authority and realm of the separate States. Yet it is further established that Congress, in enacting discrete statutes, can make determinations that bear on marital rights and privileges. Just this Term the Court upheld the authority of the Congress to pre-empt state laws, allowing a former spouse to retain life insurance proceeds under a federal program that gave her priority, because of formal beneficiary designation rules, over the wife by a second marriage who survived the husband. Hillman v. Maretta, 569 U.S. ----, 133 S.Ct. 1943, 186 L.Ed.2d 43 (2013) ; see also Ridgway v. Ridgway, 454 U.S. 46, 102 S.Ct. 49, 70 L.Ed.2d 39 (1981) ; Wissner v. Wissner, 338 U.S. 655, 70 S.Ct. 398, 94 L.Ed. 424 (1950). This is one example of the general principle that when the Federal Government acts in the *765 exercise of its own proper authority, it has a wide choice of the mechanisms and means to adopt. See McCulloch v. Maryland, 4 Wheat. 316, 421, 4 L.Ed. 579 (1819). Congress has the power both to ensure efficiency in the administration of its programs and to choose what larger goals and policies to pursue.
Other precedents involving congressional statutes which affect marriages and family status further illustrate this point. In addressing the interaction of state domestic relations and federal immigration law Congress determined that marriages "entered into for the purpose of procuring an alien's admission [to the United States] as an immigrant" will not qualify the noncitizen for that status, even if the noncitizen's marriage is valid and proper for state-law purposes. 8 U.S.C. § 1186a(b)(1) (2006 ed. and Supp. V). And in establishing income-based criteria for Social Security benefits, Congress decided that although state law would determine in general who qualifies as an applicant's spouse, common-law marriages also should be recognized, regardless of any particular State's view on these relationships. 42 U.S.C. § 1382c(d)(2).
Though these discrete examples establish the constitutionality of limited federal laws that regulate the meaning of marriage in order to further federal policy, DOMA has a far greater reach; for it enacts a directive applicable to over 1,000 federal statutes and the whole realm of federal regulations. And its operation is directed to a class of persons that the laws of New York, and of 11 other States, have sought to protect. See Goodridge v. Department of Public Health, 440 Mass. 309, 798 N.E.2d 941 (2003) ; An Act Implementing the Guarantee of Equal Protection Under the Constitution of the State for Same Sex Couples, 2009 Conn. Pub. Acts no. 09-13; Varnum v. Brien, 763 N.W.2d 862 (Iowa 2009) ; Vt. Stat. Ann., Tit. 15, § 8 (2010); N.H.Rev.Stat. Ann. § 457:1-a (West Supp.2012) ; Religious Freedom and Civil Marriage Equality Amendment Act of 2009, 57 D.C. Reg. 27 (Dec. 18, 2009); N.Y. Dom. Rel. Law Ann. § 10-a (West Supp. 2013);
*766 Wash. Rev.Code § 26.04.010 (2012); Citizen Initiative, Same-Sex Marriage, Question 1 (Me. 2012) (results online at http:// www.maine.gov/sos/cec/elec/2012/tab-ref-2012.html (all Internet sources as visited June 18, 2013, and available in Clerk of Court's case file)); Md. Fam. Law Code Ann. § 2-201 (Lexis 2012) ; An Act to Amend Title 13 of the Delaware Code Relating to Domestic Relations to Provide for Same-Gender Civil Marriage and to Convert Existing Civil Unions to Civil Marriages, 79 Del. Laws ch. 19 (2013); An act relating to marriage; providing for civil marriage between two persons; providing for exemptions and protections based on religious association, 2013 Minn. Laws ch. 74; An Act Relating to Domestic Relations-Persons Eligible to Marry, 2013 R. I. Laws ch. 4.
*2691 In order to assess the validity of that intervention it is necessary to discuss the extent of the state power and authority over marriage as a matter of history and tradition. State laws defining and regulating marriage, of course, must respect the constitutional rights of persons, see, e.g., Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) ; but, subject to those guarantees, "regulation of domestic relations" is "an area that has long been regarded as a virtually exclusive province of the States." Sosna v. Iowa, 419 U.S. 393, 404, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975).
The recognition of civil marriages is central to state domestic relations law applicable to its residents and citizens. See Williams v. North Carolina, 317 U.S. 287, 298, 63 S.Ct. 207, 87 L.Ed. 279 (1942) ("Each state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders"). The definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the "[p]rotection of offspring, property interests, and the enforcement of marital responsibilities." Ibid . "[T]he states, at the time of the adoption of the Constitution, possessed full power over the subject of marriage and divorce ... [and] the Constitution delegated no authority to the Government of the United *767 States on the subject of marriage and divorce." Haddock v. Haddock, 201 U.S. 562, 575, 26 S.Ct. 525, 50 L.Ed. 867 (1906) ; see also In re Burrus, 136 U.S. 586, 593-594, 10 S.Ct. 850, 34 L.Ed. 500 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States").
Consistent with this allocation of authority, the Federal Government, through our history, has deferred to state-law policy decisions with respect to domestic relations. In De Sylva v. Ballentine, 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956), for example, the Court held that, "[t]o decide who is the widow or widower of a deceased author, or who are his executors or next of kin," under the Copyright Act "requires a reference to the law of the State which created those legal relationships" because "there is no federal law of domestic relations." Id., at 580, 76 S.Ct. 974. In order to respect this principle, the federal courts, as a general rule, do not adjudicate issues of marital status even when there might otherwise be a basis for federal jurisdiction. See Ankenbrandt v. Richards, 504 U.S. 689, 703, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992). Federal courts will not hear divorce and custody cases even if they arise in diversity because of "the virtually exclusive primacy ... of the States in the regulation of domestic relations." Id., at 714, 112 S.Ct. 2206 (Blackmun, J., concurring in judgment).
The significance of state responsibilities for the definition and regulation of marriage dates to the Nation's beginning; for "when the Constitution was adopted the common understanding was that the domestic relations of husband and wife and parent and child were matters reserved to the States." Ohio ex rel. Popovici v. Agler, 280 U.S. 379, 383-384, 50 S.Ct. 154, 74 L.Ed. 489 (1930). Marriage laws vary in some respects from State to State. For example, the required minimum age is 16 in Vermont, but only 13 in New Hampshire. Compare Vt. Stat. Ann., Tit. 18, § 5142 (2012), with N.H.Rev.Stat. Ann. § 457:4 (West Supp.2012). Likewise the permissible degree of consanguinity can vary (most States permit first cousins to marry, *768 but a handful-such as Iowa and Washington, see Iowa Code § 595.19 (2009); Wash. Rev.Code § 26.04.020 *2692 (2012)-prohibit the practice). But these rules are in every event consistent within each State.
Against this background DOMA rejects the long-established precept that the incidents, benefits, and obligations of marriage are uniform for all married couples within each State, though they may vary, subject to constitutional guarantees, from one State to the next. Despite these considerations, it is unnecessary to decide whether this federal intrusion on state power is a violation of the Constitution because it disrupts the federal balance. The State's power in defining the marital relation is of central relevance in this case quite apart from principles of federalism. Here the State's decision to give this class of persons the right to marry conferred upon them a dignity and status of immense import. When the State used its historic and essential authority to define the marital relation in this way, its role and its power in making the decision enhanced the recognition, dignity, and protection of the class in their own community. DOMA, because of its reach and extent, departs from this history and tradition of reliance on state law to define marriage. " '[D]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision.' " Romer v. Evans, 517 U.S. 620, 633, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (quoting Louisville Gas & Elec. Co. v. Coleman, 277 U.S. 32, 37-38, 48 S.Ct. 423, 72 L.Ed. 770 (1928) ).
The Federal Government uses this state-defined class for the opposite purpose-to impose restrictions and disabilities. That result requires this Court now to address whether the resulting injury and indignity is a deprivation of an essential part of the liberty protected by the Fifth Amendment. What the State of New York treats as alike the federal law deems unlike by a law designed to injure the same class the State seeks to protect.
*769 In acting first to recognize and then to allow same-sex marriages, New York was responding "to the initiative of those who [sought] a voice in shaping the destiny of their own times." Bond v. United States, 564 U.S. ----, ----, 131 S.Ct. 2355, 2359, 180 L.Ed.2d 269 (2011). These actions were without doubt a proper exercise of its sovereign authority within our federal system, all in the way that the Framers of the Constitution intended. The dynamics of state government in the federal system are to allow the formation of consensus respecting the way the members of a discrete community treat each other in their daily contact and constant interaction with each other.
The States' interest in defining and regulating the marital relation, subject to constitutional guarantees, stems from the understanding that marriage is more than a routine classification for purposes of certain statutory benefits. Private, consensual sexual intimacy between two adult persons of the same sex may not be punished by the State, and it can form "but one element in a personal bond that is more enduring." Lawrence v. Texas, 539 U.S. 558, 567, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). By its recognition of the validity of same-sex marriages performed in other jurisdictions and then by authorizing same-sex unions and same-sex marriages, New York sought to give further protection and dignity to that bond. For same-sex couples who wished to be married, the State acted to give their lawful conduct a lawful status. This status is a far-reaching legal acknowledgment of the intimate relationship between two people, a relationship deemed by the State worthy of dignity in the community equal with all other marriages. It reflects both the community's considered perspective on the historical *2693 roots of the institution of marriage and its evolving understanding of the meaning of equality.
IV
DOMA seeks to injure the very class New York seeks to protect. By doing so it violates basic due process and equal protection principles applicable to the Federal Government.
*770 See U.S. Const., Amdt. 5; Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The Constitution's guarantee of equality "must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot" justify disparate treatment of that group. Department of Agriculture v. Moreno, 413 U.S. 528, 534-535, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). In determining whether a law is motived by an improper animus or purpose, " ' [d]iscriminations of an unusual character' " especially require careful consideration. Supra, at 2692 (quoting Romer, supra, at 633, 116 S.Ct. 1620). DOMA cannot survive under these principles. The responsibility of the States for the regulation of domestic relations is an important indicator of the substantial societal impact the State's classifications have in the daily lives and customs of its people. DOMA's unusual deviation from the usual tradition of recognizing and accepting state definitions of marriage here operates to deprive same-sex couples of the benefits and responsibilities that come with the federal recognition of their marriages. This is strong evidence of a law having the purpose and effect of disapproval of that class. The avowed purpose and practical effect of the law here in question are to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the unquestioned authority of the States.
The history of DOMA's enactment and its own text demonstrate that interference with the equal dignity of same-sex marriages, a dignity conferred by the States in the exercise of their sovereign power, was more than an incidental effect of the federal statute. It was its essence. The House Report announced its conclusion that "it is both appropriate and necessary for Congress to do what it can to defend the institution of traditional heterosexual marriage.... H.R. 3396 is appropriately entitled the 'Defense of Marriage Act.' The effort to redefine 'marriage' to extend to homosexual couples is a truly radical proposal that would fundamentally alter the institution of marriage."
*771 H.R.Rep. No. 104-664, pp. 12-13 (1996). The House concluded that DOMA expresses "both moral disapproval of homosexuality, and a moral conviction that heterosexuality better comports with traditional (especially Judeo-Christian) morality." Id., at 16 (footnote deleted). The stated purpose of the law was to promote an "interest in protecting the traditional moral teachings reflected in heterosexual-only marriage laws."Ibid. Were there any doubt of this far-reaching purpose, the title of the Act confirms it: The Defense of Marriage.
The arguments put forward by BLAG are just as candid about the congressional purpose to influence or interfere with state sovereign choices about who may be married. As the title and dynamics of the bill indicate, its purpose is to discourage enactment of state same-sex marriage laws and to restrict the freedom and choice of couples married under those laws if they are enacted. The congressional goal was "to put a thumb on the scales and influence a state's decision as to how to shape its own marriage laws." Massachusetts, 682 F.3d, at 12-13. The Act's demonstrated purpose is to ensure that if any State decides to recognize same-sex marriages, those unions will be treated as second-class marriages *2694 for purposes of federal law. This raises a most serious question under the Constitution's Fifth Amendment.
DOMA's operation in practice confirms this purpose. When New York adopted a law to permit same-sex marriage, it sought to eliminate inequality; but DOMA frustrates that objective through a system-wide enactment with no identified connection to any particular area of federal law. DOMA writes inequality into the entire United States Code. The particular case at hand concerns the estate tax, but DOMA is more than a simple determination of what should or should not be allowed as an estate tax refund. Among the over 1,000 statutes and numerous federal regulations that DOMA controls are laws pertaining to Social Security, housing, taxes, criminal sanctions, copyright, and veterans' benefits.
*772 DOMA's principal effect is to identify a subset of state-sanctioned marriages and make them unequal. The principal purpose is to impose inequality, not for other reasons like governmental efficiency. Responsibilities, as well as rights, enhance the dignity and integrity of the person. And DOMA contrives to deprive some couples married under the laws of their State, but not other couples, of both rights and responsibilities. By creating two contradictory marriage regimes within the same State, DOMA forces same-sex couples to live as married for the purpose of state law but unmarried for the purpose of federal law, thus diminishing the stability and predictability of basic personal relations the State has found it proper to acknowledge and protect. By this dynamic DOMA undermines both the public and private significance of state-sanctioned same-sex marriages; for it tells those couples, and all the world, that their otherwise valid marriages are unworthy of federal recognition. This places same-sex couples in an unstable position of being in a second-tier marriage. The differentiation demeans the couple, whose moral and sexual choices the Constitution protects, see Lawrence, 539 U.S. 558, 123 S.Ct. 2472, and whose relationship the State has sought to dignify. And it humiliates tens of thousands of children now being raised by same-sex couples. The law in question makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives.
Under DOMA, same-sex married couples have their lives burdened, by reason of government decree, in visible and public ways. By its great reach, DOMA touches many aspects of married and family life, from the mundane to the profound. It prevents same-sex married couples from obtaining government healthcare benefits they would otherwise receive. See 5 U.S.C. §§ 8901(5), 8905. It deprives them of the Bankruptcy Code's special protections for domestic-support obligations. See 11 U.S.C. §§ 101(14A), *773 507(a) (1)(A), 523(a)(5), 523(a)(15). It forces them to follow a complicated procedure to file their state and federal taxes jointly. Technical Bulletin TB-55, 2010 Vt. Tax LEXIS 6 (Oct. 7, 2010); Brief for Federalism Scholars as Amici Curiae 34. It prohibits them from being buried together in veterans' cemeteries. National Cemetery Administration Directive 3210/1, p. 37 (June 4, 2008).
For certain married couples, DOMA's unequal effects are even more serious. The federal penal code makes it a crime to "assaul[t], kidna[p], or murde[r] ... a member of the immediate family" of "a United States official, a United States judge, [or] a Federal law enforcement officer," 18 U.S.C. § 115(a)(1)(A), with the intent to influence or retaliate against that *2695 official, § 115(a)(1). Although a "spouse" qualifies as a member of the officer's "immediate family," § 115(c)(2), DOMA makes this protection inapplicable to same-sex spouses.
DOMA also brings financial harm to children of same-sex couples. It raises the cost of health care for families by taxing health benefits provided by employers to their workers' same-sex spouses. See 26 U.S.C. § 106 ; Treas. Reg. § 1.106-1, 26 CFR § 1.106-1 (2012) ; IRS Private Letter Ruling 9850011 (Sept. 10, 1998). And it denies or reduces benefits allowed to families upon the loss of a spouse and parent, benefits that are an integral part of family security. See Social Security Administration, Social Security Survivors Benefits 5 (2012) (benefits available to a surviving spouse caring for the couple's child), online at http://www.ssa.gov/pubs/EN-05-10084.pdf.
DOMA divests married same-sex couples of the duties and responsibilities that are an essential part of married life and that they in most cases would be honored to accept were DOMA not in force. For instance, because it is expected that spouses will support each other as they pursue educational opportunities, federal law takes into consideration a spouse's income in calculating a student's federal financial aid *774 eligibility. See 20 U.S.C. § 1087nn(b). Same-sex married couples are exempt from this requirement. The same is true with respect to federal ethics rules. Federal executive and agency officials are prohibited from "participat[ing] personally and substantially" in matters as to which they or their spouses have a financial interest. 18 U.S.C. § 208(a). A similar statute prohibits Senators, Senate employees, and their spouses from accepting high-value gifts from certain sources, see 2 U.S.C. § 31-2(a)(1), and another mandates detailed financial disclosures by numerous high-ranking officials and their spouses. See 5 U.S.C.App. §§ 102(a), (e). Under DOMA, however, these Government-integrity rules do not apply to same-sex spouses.
* * *
The power the Constitution grants it also restrains. And though Congress has great authority to design laws to fit its own conception of sound national policy, it cannot deny the liberty protected by the Due Process Clause of the Fifth Amendment.
What has been explained to this point should more than suffice to establish that the principal purpose and the necessary effect of this law are to demean those persons who are in a lawful same-sex marriage. This requires the Court to hold, as it now does, that DOMA is unconstitutional as a deprivation of the liberty of the person protected by the Fifth Amendment of the Constitution.
The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws. See Bolling, 347 U.S., at 499-500, 74 S.Ct. 693; Adarand Constructors, Inc. v. Penã, 515 U.S. 200, 217-218, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). While the Fifth Amendment itself withdraws from Government the power to degrade or demean in the way this law does, the equal protection guarantee of the Fourteenth Amendment makes that Fifth Amendment right all the more specific and all the better understood and preserved.
*775 The class to which DOMA directs its restrictions and restraints are those persons who are joined in same-sex marriages made lawful by the State. DOMA singles out a class of persons deemed by a State entitled to recognition and protection to enhance their own liberty. It imposes a *2696 disability on the class by refusing to acknowledge a status the State finds to be dignified and proper. DOMA instructs all federal officials, and indeed all persons with whom same-sex couples interact, including their own children, that their marriage is less worthy than the marriages of others. The federal statute is invalid, for no legitimate purpose overcomes the purpose and effect to disparage and to injure those whom the State, by its marriage laws, sought to protect in personhood and dignity. By seeking to displace this protection and treating those persons as living in marriages less respected than others, the federal statute is in violation of the Fifth Amendment. This opinion and its holding are confined to those lawful marriages.
The judgment of the Court of Appeals for the Second Circuit is affirmed.
It is so ordered.