*593 DIAZ, Circuit Judge:
Virginia Uranium, Inc., Coles Hill, LLC, Bowen Minerals, LLC, and Virginia Energy Resources, Inc. (collectively ‘Virginia Uranium”) appeal the district court’s dismissal of their complaint for failure to state a claim upon which relief can be granted. Because we agree with the district court that federal law does not preempt state regulation of conventional uranium mining, we affirm.
I.
A.
The federal Atomic Energy Act (“AEA” or “Act”) regulates several aspects of nuclear power generation in the United States, including “source material” such as uranium. 42 U.S.C. §§ 2011, 2014(z). The Nuclear Regulatory Commission (“NRC”) enforces the provisions of the Act. Id. §§ 2201, 5801, 5841.
Uranium is the predominant source of fuel for nuclear power plants and fissile material for nuclear warheads. Uranium ore can be recovered from a deposit either through in situ leaching or by conventional mining such as an open-pit or underground mine.[1]
Once removed from the ground, uranium ore is milled into a refined product called “yellowcake.” Yellowcake can be used to make nuclear fuel, but the remaining unused material — known as “tailings” — is radioactive and must be stored securely.
B.
In the early 1980s, a uranium deposit was discovered in Pittsylvania County, Virginia on land owned by Coles Hill, LLC and Bowen Minerals, LLC. Containing 119 million pounds of uranium ore, the Coles Hill deposit was then (and remains) the largest known uranium deposit in the United States.
The Virginia General Assembly reacted to this discovery by calling for the state Coal and Energy Commission to “evaluate the environmental effects ... and any possible detriments to the health, safety, and welfare of Virginia citizens which may result from uranium exploration, mining or milling.” 1981 Va. Acts 1404. Before the Commission completed its report, however, the General Assembly imposed a moratorium (or “ban”) on uranium mining “until a program for permitting uranium mining is established by statute.” Va. Code Ann. § 45.1-283.
The Commission ultimately reported to the Governor and General Assembly in 1985 that the state could lift “the moratorium on uranium development” if it followed “essential specific recommendations ... of the task force” and enacted laws to tightly regulate the industry. J.A. 534-38. The recommendations included limiting public exposure to radiation, issuing mill and tailings licenses in cooperation with the NRC, and regulating hazardous waste. The benefits of uranium mining in Virginia, the Commission found, “outweighed the costs 26 to 1.” J.A. 543. Despite the Commission’s recommendation, the General Assembly did not move to lift the moratorium.
In January 2013, Virginia State Senators John Watkins and Richard Saslaw sponsored a bill to create a licensing scheme for the issuance of uranium mining permits. The bill was never voted on, and was later withdrawn. To date, no such program has been established, and the ban remains in effect.
*594 Stymied in its efforts to mine the Coles Hill deposit, Virginia Uranium brought suit in the United States District Court for the Western District of Virginia, asking the court to declare the ban preempted by federal law and issue an injunction compelling the Commonwealth to grant uranium mining permits.
The Defendant Commonwealth of Virginia officials (collectively the “Commonwealth”) moved to dismiss the Plaintiffs’ complaint, and Virginia Uranium moved for summary judgment. The district court granted the Commonwealth’s motion and dismissed the complaint. The court found that federal law (specifically the Atomic Energy Act) “does not ... regulate non-federal uranium deposits or their conventional mining.” Virginia Uranium, Inc. v. McAuliffe, 147 F.Supp.3d 462, 47-1 (W.D. Va. 2015). Finding that the Act does not commit conventional uranium mining to the NRC’s authority, the district court distinguished the instant case from Supreme Court precedent requiring states to have a non-safety rationale to regulate activities within the NRC’s purview. The district court further held that Virginia’s ban “does not obstruct the realization of Congress’ purposes and objectives behind the [Act]” because Congress “evinced no purpose or objective that nonfederal uranium deposits be conventionally mined.” Id. at 477.
This appeal followed.
II.
We review de novo the district court’s conclusion that the Atomic Energy Act does not preempt Virginia’s ban on uranium mining. Epps v. JP Morgan Chase Bank, N.A., 675 F.3d 315, 320 (4th Cir. 2012). State laws may be preempted by federal law under the Supremacy Clause, which provides that “[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.” U.S. Const, art. VI, cl. 2.
“[T]he first and fundamental question in any pre-emption analysis is whether Congress intended to displace state law....” Wardair Canada, Inc. v. Fla. Dep’t of Revenue, 477 U.S. 1, 6, 106 S.Ct. 2369, 91 L.Ed.2d 1 (1986). Congressional intent to “supercede state law ... may be found from a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room to supplement it,” otherwise known as “field” preemption. Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm’n, 461 U.S. 190, 203-04, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) (internal quotation marks omitted). State law may also be preempted as in “conflict” with federal law when it “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Id. at 204, 103 S.Ct. 1713 (citing Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).
Virginia Uranium offers three reasons why the Atomic Energy Act preempts Virginia’s ban on uranium mining. First, it urges that conventional uranium mining is an “activity” under Section 2021(k) of the Act and that the Commonwealth therefore may not regulate it out of concern for radiological safety. Second, it contends that even if 'uranium mining is not a regulated “activity” under the Act, uranium-ore milling and tailings storage are regulated activities, and because the Virginia legislature intended to and does regulate those activities, the ban is therefore preempted. Finally, Virginia Uranium says that the ban is preempted because it’s an obstacle to the full implementation of the Act’s *595 objectives. We address these arguments in turn.
A.
We begin with Virginia Uranium’s claim that conventional uranium mining is an “activity” under Section 2021(k) of the Atomic Energy Act, which in turn means that states can’t regulate such mining for the purpose of protecting against radiation hazards. Section 2021 of the Act, entitled “Cooperation with States,” outlines “the respective responsibilities ... of the States and the [Nuclear Regulatory] Commission with respect to the regulation of byproduct, source, and special nuclear materials.” 42 U.S.C. § 2021(a). Subsection (k) reserves to the states the right to “regulate activities for purposes other than protection against radiation hazards.” Id. § 2021(k).
In Pacific Gas, the Supreme Court interpreted this provision as establishing the bounds of the Act’s preemptive reach. Specifically, the Court instructed that “the test of pre-emption is whether the matter on which the state asserts the right to act is in any way regulated by the federal government.” Pacific Gas, 461 U.S. at 213, 103 S.Ct. 1713 (internal citations omitted). If a state purports to regulate an activity that is also regulated by the Act, a court must “determine whether there is a non-safety rationale” for the state rule. Id. If there is not, then the state law is preempted.
The Court in Pacific Gas addressed California regulations imposing conditions on the construction of new nuclear power plants in the state. Utilities seeking to construct nuclear plants in California had to obtain permission from the State Energy Resources and Conservation Commission. Id. at 197, 103 S.Ct. 1713. But the Commission would only grant a permit to build if it determined that there was “adequate capacity” for storage of spent fuel rods and that the utility would provide “continuous, on-site, full core reserve storage capacity.” Id. at 197-98, 103 S.Ct. 1713 (internal quotation marks omitted). In passing these regulations, the California legislature denied that they were “designed to provide protection against radiation hazards” but instead were “adopted because ‘uncertainties in the nuclear fuel cycle [made] nuclear power an uneconomical and uncertain source of energy.’ ” Id. at 199-200, 103 S.Ct. 1713.
The California regulations, the Court held, fell “squarely within the prohibited field.” Id. at 213, 103 S.Ct. 1713.[2] After considering arguments for why the regulations might have been enacted for safety (as opposed to economic) reasons, the Court opted against “attempting to ascertain California’s true motive” and instead “accepted] California’s avowed economic purpose.” Id. at 216, 103 S.Ct. 1713. Because the regulations had a non-safety rationale, the Atomic Energy Act did not preempt them. Id.
Here, the Commonwealth concedes that it lacks a non-safety rationale for banning uranium mining but says that Section 2021(k) does not apply to the ban because conventional uranium mining isn’t an activity regulated by the NRC. To test this contention, we assess whether the term “activities” within Section 2021(k) of the Act encompasses all activities states may regulate or merely, as the Commonwealth contends, “activities regulated by the [Nuclear Regulatory] Commission.” Appellees’ Br. at 35.
*596 The Supreme Court addressed this precise question in Pacific Gas and sided with the limited reading of Section 2021(k) pressed by the Commonwealth here. As we noted earlier, there, the Court explained that “the federal government has occupied the entire field of nuclear safety concerns,” but the bounds of that field are measured by looking to whether “the matter on which the state asserts the right to act is in any way regulated by the federal government.” Pacific Gas, 461 U.S. at 212-13, 103 S.Ct. 1713 (internal citations omitted); see also id. at 209-10, 103 S.Ct. 1713 (“[S]ection [2021] was not intended to cutback on pre-existing state, authority outside the NRC’s jurisdiction.”). Section 2021(k) therefore prohibits states from regulating, for safety reasons, activities that are “in any way regulated” by the federal government under the Atomic Energy Act. We agree with the district court that conventional uranium mining is not such an activity.
The Act explicitly grants the NRC authority to regulate uranium mining on federal lands, but it says nothing about the Commission’s power to regulate conventional uranium mining elsewhere. 42 U.S.C. § 2097. Section 2092 of the Act requires individuals to obtain an NRC license to “transfer, deliver, [or] receive possession of ... any source material after removal from its place of deposit in nature.” 42 U.S.C. § 2092 (emphasis added). Importantly, the NRC reads this provision as “precluding [Commission] jurisdiction over uranium mining.” In re. Hydro Resources, Inc., 63 N.R.C. 510, 512-13 (2006). Similarly, the NRC justifies regulating in situ mining by describing the method as “processing” uranium, over which the Commission has authority. Id.
When Congress has not “directly spoken to the precise question at issue,” we defer to a federal agency’s reasonable interpretation of a congressional act that the agency is charged with administering. Nat'l Labor Relations Bd. v. Bluefield Hosp. Co., 821 F.3d 534, 542 (4th Cir. 2016) (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). The Atomic Energy Act grants the NRC authority to enforce and promulgate rules under the Act. 42 U.S.C. § 2201. Federal law is silent on conventional uranium mining outside of federal lands, and the NRC reads this gap in the Act’s language to mean that the Commission lacks the power to regulate it.
This interpretation is reasonable in the context of the Act. Congress explicitly gave the NRC power to regulate conventional uranium mining on federal lands and to govern what happens to source material “after its removal from its place of deposit in nature.” Id. §§ 2902, 2907 (emphasis added). We think it logical to assume that, by expressly granting the NRC some authority over source material, Congress did not intend to implicitly grant broader authority. See Barnhart v. Peabody Coal Co., 537 U.S. 149, 168, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003) (explaining that the canon of expressio unius est exclusio al-terius may apply where “it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it”).
Additionally, the power to regulate mining — including uranium mining — has traditionally been reserved to the states. See In re Hydro Resources, 63 N.R.C. at 513. We assume that is where it remains unless Congress evinces a “clear and manifest purpose” to supersede “the historic police powers of the States.” Wyeth v. Levine, 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). Nothing in the *597 AEA indicates that Congress meant for the NRC to displace the states in regulating conventional uranium mining — the Act is silent on the matter.
Indeed, accepting Virginia Uranium’s more expansive reading of Section 2021(k)’s preemptive reach would mean that entities could mine free of government oversight. The states could not regulate and, on the NRC’s (reasonable) view of the Act, it too would be a passive spectator. That cannot be the law. Rather, because conventional uranium mining outside of federal lands is beyond the regulatory ambit of the Nuclear Regulatory Commission, it is not an “activity” under Section 2021(k) of the Act. As a result, the district court was correct to hold that Virginia’s ban on conventional uranium mining is not preempted.
B.
Virginia Uranium next contends that, even if conventional uranium mining is not an “activity” under Section 2021(k) of the Act, uranium-ore milling and tailings storage are such activities. Because the ban, according to Virginia Uranium, impermis-sibly attempts to regulate and has the effect of prohibiting those activities for nuclear safety reasons, it is preempted.
We agree that uranium milling and tail-ings storage are “activities” under Section 2021(k) because they are regulated by the NRC, and states may therefore not regulate them except for purposes other than protection against radiation hazards. See 42 U.S.C. §§ 2021, 5842, 7918-19; 10 C.F.R. § 40.3; see also supra Part II.A. But the plain language of the Commonwealth’s ban does not mention uranium milling or tailings storage. Va. Code Ann. § 45.1-283 (“[P]ermit applications for uranium mining shall not be accepted by any agency of the Commonwealth.... ”).
In the face of this telling omission, Virginia Uranium argues that no one “would want to undertake the pointless expense of constructing a mill and tailings-management complex in Virginia and transporting out-of-state uranium [ore] into the Commonwealth.” Reply Br. at 20. Given this economic reality, Virginia Uranium urges us to look past the statute’s plain meaning to decipher whether the legislature was motivated to.pass the ban by a desire to regulate uranium milling or tailings storage. We decline the invitation.
In Pacific Gas, the Court warned against the “unsatisfactory venture” of “inquiry into legislative motive.” 461 U.S. at 216, 103 S.Ct. 1713 (citing United States v. O’Brien, 391 U.S. 367, 383, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)). The Court reasoned that, when dealing with provisions such as Section 2021(k) that allow states to enact laws for some purposes but not others, it is “pointless” for courts to invalidate statutes that may then be reenacted with a different motive. Id. Rather, “it should be up to Congress to determine whether a State has misused the authority left in its hands.” Id. And even if motive inquiry were useful, the Court noted that legislative intent is often impossible to discern because “[w]hat motivates one legislator to vote for a statute is not necessarily what motivates scores of others to enact it.” Id.
There are some areas of law — such as actions arising under the Equal Protection Clause of the Fourteenth Amendment — where a legislature’s improper motive itself is cause for courts to find a law unconstitutional. In those cases, we may conduct a pretext analysis to ascertain a legislature’s true motive. See, e.g. United States v. Windsor, — U.S.-, 133 S.Ct. 2675, 2693, 186 L.Ed.2d 808 (2013) (striking down an act of Congress because it was “motived by an improper animus”); North Carolina State Conference of *598 NAACP v. McCrory, 831 F.Sd 204, 220 (4th Cir. 2016) (A law is invalid under the Equal Protection Clause if a “discriminatory purpose was ... a motivating factor” or if “the legislature enact[ed] a law ‘because of,’ and not ‘in- spite of,’ its discriminatory effect.” (internal citations omitted)). We do so in those contexts because a more searching scrutiny of legislative intent is needed in order to avoid the “cireumven-ti[on] [of] a federally protected right.” Gomillion v. Lightfoot, 864 U.S. 339, 347, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).
But this is not such a case. Because Virginia Uranium does not allege that the Virginia legislature acted with discriminatory intent, we adhere to the edict that courts “will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive,” and we decline to examine why the Commonwealth chose to ban uranium mining, which it was plainly allowed to do. O’Brien, 391 U.S. at 383, 88 S.Ct. 1673.
Virginia Uranium urges us to follow the paths forged by our sister circuits in Skull Valley Band of Goshute Indians v. Nielson, 376 F.3d 1223 (10th Cir. 2004), and Entergy Nuclear Vermont Yankee, LLC v. Shumlin, 733 F.3d 393 (2d Cir. 2013). While the courts there did strike down state laws as preempted under the AEA, the cases are distinguishable.
In Skull Valley, Plaintiffs challenged a host of Utah laws that, while facially within the state’s police powers, surgically targeted the transportation and storage of spent nuclear fuel. 376 F.3d at 1228-30. Spent nuclear fuel storage, the Tenth Circuit found, is an activity regulated by the NRC. Id. at 1242. Moreover, unlike Virginia’s ban on mining, all but. two of the challenged Utah laws specifically mentioned this NRC-regulated activity. Id. at 1245-51, 1253-54.
One subset of changes to Utah’s laws purported to focus solely on transportation by designating certain local roads near the site of a proposed spent nuclear fuel storage facility as “statewide public safety interest highways” and turning control over them to the state. Id. at 1251-52. But even this change in the law was packaged with two other transportation regulations targeting spent nuclear fuel directly. The first called for state resolution of “disputes arising out of the request to construct a railroad crossing made by an entity engaged in [spent nuclear fuel] storage and transportation,” and the second required the “consent of the governor and the state legislature before the Department of Transportation [could] grant a right of way to a company engaged in the transportation or storage of [spent nuclear fuel].” Id.
Not surprisingly, the Tenth Circuit felt no need to engage in the sort of pretext analysis that Virginia Uranium presses here to hold that Utah was purporting to govern an NRC-regulated activity. Indeed, the Commonwealth’s two-sentence moratorium on uranium mining (an activity not regulated by the NRC) pales in comparison to Utah’s comprehensive scheme intended to keep spent nuclear fuel out of the state by any means.
The Second Circuit’s decision in Entergy, on the other hand, is a straightforward application of Pacific Gas. Vermont law required the “explicit approval of the General Assembly” in order to operate a nuclear energy plant within the state. Entergy, 733 F.3d at 403. The Second Circuit sought to determine the Vermont legislature’s intent only after holding that the challenged law regulated an “activity” — the operation of nuclear power plants — within the meaning of Section 2021(k) of the Atomic Energy Act. Id. at 415. Applying Pacific Gas, it was then the court’s duty to determine whether the state was “impermissiblfy] *599 motiv[ated]” by nuclear safety concerns. Id. at 418-19.
The Second Circuit held that “the Vermont Legislature was improperly motivated by concerns relating to radiological safety in enacting” the challenged law, and therefore, the statute was “preempted on its face by the Atomic Energy Act.” Id. at 422. In contrast, the Commonwealth’s mining ban does not purport to regulate an activity within the Act’s reach, and thus we need proceed no further.
C.
Finally, Virginia Uranium contends that the Commonwealth’s ban on conventional mining is preempted as an obstacle' to the full implementation of the objectives of the Atomic Energy Act. We will find state laws preempted as in conflict with federal law if the state law “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). But we do not easily find preemption; rather we start with “the assumption that the historic police powers of the States [are not] superseded by [Federal law] unless that was the clear and manifest purpose of Congress.” Wyeth, 555 U.S. at 565, 129 S.Ct. 1187 (quoting Medtronic, 518 U.S. at 485, 116 S.Ct. 2240).
Determining whether a state law “stands as an obstacle” to federal law is a two-step process. First, we determine Congress’s “significant objective[s]” in passing the federal law. Williamson v. Mazda Motor of America, Inc., 562 U.S. 323, 330, 131 S.Ct. 1131, 179 L.Ed.2d 75 (2011). We then turn to whether the state law stands “as an obstacle to the accomplishment of a significant federal regulatory objective.” Id. (internal citations omitted).
Here, the parties do not dispute the Atomic Energy Act’s stated purpose of promoting the safe development and use of atomic energy. 42 U.S.C. § 2012; see also Pacific Gas, 461 U.S. at 221, 103 S.Ct. 1713 (“There is little doubt that a primary purpose of the [Act] was, and continues to be, the promotion of nuclear power.”). Virginia Uranium claims that the Commonwealth has created an obstacle to that Congressional purpose by banning uranium mining outright. It asks us to “imagine what would become of Congress’s desire to encourage the development and use of uranium if all 50 states enacted similar legislation.” Appellants’ Br. at 56.
In fact, this hypothetical nationwide web of mining bans would have little effect. Why? For starters, over ninety percent of the uranium used by the country’s atomic-energy industry is imported, so state bans on domestic production would have negligible effect. Moreover, as of 2015, eighteen domestic uranium recovery facilities— those that either use in situ leaching or are located on federal lands — are licensed by the NRC and thus beyond the reach of any state bans. Finally, if push comes to shove, the Atomic Energy Act allows the federal government to forcibly expand the production of domestic source material: The NRC may “purchase, condemn, or otherwise acquire ... real property containing deposits of source material.” 42 U.S.C. § 2096. In sum, Congress’s purposes and objectives in passing the Act are not materially affected by the Commonwealth’s ban on conventional uranium mining. The district court properly dismissed this case.
III.
For the reasons given, we affirm the district court’s judgment.

AFFIRMED

. In situ leaching is a process by which chemicals are pumped through drilled wells into uranium deposits, altering the ore and pumping a uranium solution back to the surface.

. As the district court in the instant case noted when discussing Pacific Gas, the construction of a nuclear power plant is an activity “clearly committed to the NRC's regulatory authority.” Virginia Uranium, 147 F.Supp.3d at 476 (citing 42 U.S.C. § 2021(c)(1)).