J-A05040-17

2017 PA Super 104

| | |
|---|---|
| IN RE: ESTATE OF STEPHEN CARTER | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: MICHAEL HUNTER | No. 1126 WDA 2016 |

Appeal from the Order Entered July 8, 2016
In the Court of Common Pleas of Beaver County
Orphans' Court at No(s): 04-13-00540

BEFORE:  BENDER, P.J.E., SHOGAN, J., and MOULTON, J.

OPINION BY MOULTON, J.:                    **FILED APRIL 17, 2017**

Michael Hunter appeals from the July 8, 2016 order of the Beaver County Court of Common Pleas denying Hunter's petition for a declaration that he and his late partner, Stephen Carter, had entered into a common law marriage prior to January 1, 2005.[1]  Because the United States Constitution mandates that same-sex couples have the same right to prove a common law marriage as do opposite-sex couples, and because we conclude that

---

[1] The Pennsylvania General Assembly abolished the doctrine of common law marriage effective January 24, 2005, but also provided that "[n]othing in this part shall be deemed or taken to render any common-law marriage otherwise lawful and contracted on or before January 1, 2005, invalid."  23 Pa.C.S. § 1103; *cf. PNC Bank Corp. v. Workers' Comp. Appeal Bd. (Stamos)*, 831 A.2d 1269, 1281-83 (Pa.Cmwlth. 2003) (prospectively abolishing doctrine of common law marriage in Pennsylvania).

Hunter met his burden of proving a common law marriage, we reverse and remand.

Hunter and Carter met in February 1996 at a social event in Philadelphia and began dating a few days later. N.T., 7/5/16, at 8. During the course of their ensuing 17-year relationship, they shared a mutual enjoyment of rock climbing, canoeing, kayaking, and hiking. *Id.* at 9. In July 1996, Hunter and Carter began living together in Carter's home in Philadelphia. *Id.* at 9-10.

On Christmas Day 1996, Hunter proposed to Carter and gave him a diamond ring. *Id.* at 12. Hunter bent down on one knee and asked, "Will you marry me?" to which Carter replied, "Yes." *Id.* Two months later, on February 18, 1997, Carter gave Hunter a ring in return; the ring was engraved, "February 18, 1997." *Id.* at 12-13, 41. One year later, Hunter and Carter celebrated their first wedding anniversary, a ritual they repeated on February 18 of each year for the next 16 years. *See id.* at 41-42.

In March 1999, Hunter and Carter purchased a home together in Philadelphia with a joint mortgage in both of their names. *Id.* at 13-15. They prepared and executed mutual wills, in which each named the other as executor. *Id.* at 19-20, 29. They executed mutual financial and health care powers of attorney, in which each designated the other as his agent-in-fact. *Id.* at 19-21, 28-29 & Exs. H-K. They also supported each other financially and held joint banking and investment accounts. *Id.* at 26-28. At various points in their relationship, each served as the sole wage earner while the

other advanced his education. *Id.* at 16-17, 25-26. The couple later moved to the Pittsburgh area and jointly purchased a home there. *Id.* at 17-18.

Both of their families treated Hunter and Carter as spouses, with Carter's nieces referring to Hunter as "Uncle Mike." *Id.* at 23, 38-39. Hunter and Carter considered themselves married as of February 18, 1997 and referred to each other as spouses from that day forward. *Id.* at 41.

In April 2013, Carter died from injuries sustained in a motorcycle accident. *Id.* at 18, 29. His death occurred less than two months before the United States Supreme Court's landmark decision in *United States v. Windsor*, 133 S.Ct. 2675 (2013), which struck down the provision of the federal Defense of Marriage Act ("DOMA") defining "marriage" as only between one man and one woman.

On May 17, 2016, Hunter filed a petition seeking a declaration that he and Carter had entered into a common law marriage prior to January 1, 2005, the date after which common law marriages were no longer recognized in Pennsylvania. *See supra* n.1. On July 5, 2016, the trial court held an evidentiary hearing, at which Hunter, Carter's sister, and a friend of the couple testified in support of the petition.[2] Notably, the petition was unopposed. Neither any member of Carter's family nor any government

_____

[2] The trial court also considered several affidavits filed in support of Hunter's petition. *See* N.T., 7/5/16, at 34; Decl. Judg. Compl. & Pet. for Declaration, Exs. A-F.

agency objected to the requested declaration. Both the Pennsylvania Department of Revenue and the United States Social Security Administration expressly declined to participate in the proceedings, despite the possible financial consequences arising from the legal determination of Hunter and Carter's marital status. Despite the lack of opposition, on July 8, 2016, the trial court entered an order denying the petition.

In its opinion, the trial court offered two grounds for its decision. First, the trial court held:

> [S]ame-sex couples did not have the right to marry in Pennsylvania until May of 2014. **See Whitewood v. Wolf**, 992 F. Supp. 2d 410, 424 (M.D. Pa. 2014), *appeal dismissed sub nom.* **Whitewood v. Sec. Pa. Dept. of Health**, 621 Fed. Appx. 141 (3d Cir. 2015)(unpublished). Because of this, it was never legal for same-sex couples to enter into a common law marriage, even if they met the requirements of **Staudenmayer** [**v. Staudenmayer**, 714 A.2d 1016 (Pa. 1998),] and established a relationship prior to abolishment [of common law marriage] on January 1, 2005. This Court must follow the established precedent, and as such, this Court cannot find that [Hunter] and [Carter] had a common law marriage as it was legally impossible for them to enter into a common law marriage before common law marriages were abolished in Pennsylvania.

Rule 1925(a) Opinion, 9/16/16, at 5 ("1925(a) Op."). Second, the trial court concluded that "[e]ven if the case law recognized same-sex common law marriages, [Hunter] did not establish that he and [Carter] had a common law marriage." **Id.** In particular, the court found that Hunter had only "established that he had a future intention of marrying" Carter "when it was

- 4 -

legal in Pennsylvania," rather than a present intent to establish a marital relationship. *Id.*

Hunter filed a motion for reconsideration, which the trial court denied. On August 2, 2016, Hunter timely appealed to this Court, challenging both bases for the trial court's denial of his petition.[3]

Our standard of review in a declaratory judgment action is

> limited to determining whether the trial court clearly abused its discretion or committed an error of law. If the trial court's determination is supported by the record, we may not substitute our own judgment for that of the trial court. The application of the law, however, is always subject to our review.

*Vignola v. Vignola*, 39 A.3d 390, 393 (Pa.Super. 2012) (quoting *Bianchi v. Bianchi*, 859 A.2d 511, 515 (Pa.Super. 2004)). With this standard in mind, we review the merits of Hunter's appeal.

## The Right of Same-Sex Couples to Common Law Marriage

First, Hunter asserts that the trial court erred in concluding that it was "legally impossible" for him and Carter to enter into a pre-2005 common law marriage because, at that time, the Pennsylvania Marriage Law defined marriage as a union "between one man and one woman." 23 Pa.C.S. § 1102; *see id.* § 1704. Hunter contends that because these provisions so defining marriage have been declared unconstitutional, they cannot preclude the recognition of his pre-2005 common law marriage to Carter. We agree.

_____

[3] Hunter's appeal, like his petition in the trial court, is unopposed.

- 5 -

Historically, Pennsylvania defined marriage as "a civil contract made between parties with the capacity to so contract." *In re Estate of Garges*, 378 A.2d 307, 308 (Pa. 1977). Pennsylvania has recognized two types of marriage: ceremonial and common law. *In re Estate of Manfredi*, 159 A.2d 697, 700 (Pa. 1960). "A ceremonial marriage is a wedding or marriage performed by a religious or civil authority with the usual or customary ceremony or formalities." *Id.* "[A] common law marriage is a marriage by the express agreement of the parties without ceremony, and almost invariably without a witness, *by words* – not in futuro or in postea, but – *in praesenti*, uttered with a view and for the purpose of establishing the relationship of husband and wife." *Id.* (italics in original).

As noted above, the Pennsylvania legislature abolished the doctrine of common law marriage effective January 1, 2005. *See* 23 Pa.C.S. § 1103. However, section 1103 of the Marriage Law permits the legal recognition of common law marriages contracted before January 1, 2005. *See id.*

The proper procedure for obtaining legal recognition of a common law marriage is the filing of a declaratory judgment action. *See Vignola*, 39 A.3d at 392-93. Section 3306 of the Domestic Relations Code provides:

> When the validity of a marriage is denied or doubted, either or both of the parties to the marriage may bring an action for a declaratory judgment seeking a declaration of the validity or invalidity of the marriage and, upon proof of the validity or invalidity of the marriage, the marriage shall be declared valid or invalid by decree of the court and, unless reversed upon appeal, the declaration shall be conclusive upon all persons concerned.

23 Pa.C.S. § 3306. This procedure is necessarily retrospective and often difficult, given the absence of a formal ceremony marking the occasion of the marriage. **See Garges**, 378 A.2d at 309 ("Proving the existence of a marriage contract, except where it is entered into ceremonially, is difficult, because it is likely to arise in an informal setting, where records are not kept.").

In order to assess the trial court's "legal impossibility" reasoning, we will briefly review the relevant developments in Pennsylvania and federal law. In September 1996, the United States Congress enacted DOMA, which defined "marriage" as "only a legal union between one man and one woman as husband and wife," 1 U.S.C. § 7, and which provided that states are not required to recognize a same-sex marriage or civil union established in another state, 28 U.S.C. § 1738C. One month later, Pennsylvania amended its Marriage Law "to add anti-ceremony and anti-recognition provisions applicable to same-sex couples." **Whitewood**, 992 F.Supp.2d at 415. As a result of those amendments, section 1102 of the Marriage Law defined "marriage" as "[a] civil contract by which one man and one woman take each other for husband and wife." 23 Pa.C.S. § 1102. Section 1704 of the Marriage Law provided:

> It is hereby declared to be the strong and longstanding public policy of this Commonwealth that marriage shall be between one man and one woman. A marriage between persons of the same sex which was entered into in another state or foreign jurisdiction, even if valid where entered into, shall be void in this Commonwealth.

23 Pa.C.S. § 1704. Read together, sections 1102 and 1704 of the Marriage Law prevented same-sex couples from marrying in Pennsylvania and barred recognition in Pennsylvania of the marriages of same-sex couples legally married elsewhere.[4]

In 2013, however, just two months after Carter's untimely death, there began a "tectonic shift in the law regarding same-sex marriage." *Neyman v. Buckley*, 153 A.3d 1010, 1018 (Pa.Super. 2016). This shift started with *Windsor*, in which the United States Supreme Court struck down as unconstitutional the provision of DOMA defining "marriage" as "a legal union between one man and one woman as husband and wife" and defining "spouse" as "a person of the opposite sex who is a husband or a wife." 133 S.Ct. at 2683, 2695 (quoting 1 U.S.C. § 7).[5] The Supreme Court

_____

[4] In 1984, a panel of this Court held that a same-sex couple cannot contract a common law marriage because "under our Marriage Law it is impossible for two persons of the same sex to obtain a marriage license." *DeSanto v. Barnsley*, 476 A.2d 952, 955-56 (Pa.Super. 1984); *see id.* at 954 (noting that relevant provision of then-existing Marriage Law "refer[red] to the 'male and female applicant'") (quoting statute). Notably, this Court declined to consider the claim that the failure to recognize a common law marriage between same-sex partners violated the Equal Rights Amendment to the Pennsylvania Constitution, finding that the appellant had waived the issue. *Id.* at 956. In any event, *DeSanto* was decided under the pre-1996 version of the Marriage Law, which did not define "marriage" and which was replaced by the 1996 Marriage Law. Although *DeSanto* has not been explicitly overruled, its conclusion that a same-sex couple may not enter into common law marriage has been invalidated by the subsequent decisional law discussed in this opinion.

[5] The *Windsor* Court did not address the constitutionality of 28 U.S.C. § 1738C, which permitted states to refuse to recognize a same-sex marriage
*(Footnote Continued Next Page)*

observed that "DOMA's unusual deviation from the usual tradition of recognizing and accepting state definitions of marriage . . . operates to deprive same-sex couples of the benefits and responsibilities that come with the federal recognition of their marriages." *Id.* at 2693.[6]  The ***Windsor*** Court therefore concluded that this provision of DOMA unconstitutionally deprived same-sex couples of the liberty protected by the Fifth Amendment to the United States Constitution.  *Id.* at 2695.

Following ***Windsor***, the United States District Court for the Middle District of Pennsylvania, addressing a challenge to Pennsylvania's Marriage Law, held "that the fundamental right to marry as protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution encompasses the right to marry a person of one's own sex." ***Whitewood***, 992 F.Supp.2d at 423-24.  The district court explained:

> [T]his Court is not only moved by the logic that the fundamental right to marry is a personal right to be

*(Footnote Continued)* ─────────────

established in another state, as that provision was not challenged on appeal. 133 S.Ct. at 2682-83.

[6] The ***Windsor*** Court noted that DOMA's "comprehensive definition of marriage for purposes of all federal statutes and other regulations or directives covered by its terms . . . control[led] over 1,000 federal laws in which marital or spousal status is addressed."  133 S.Ct. at 2683; ***accord In re Adoption of R.A.B.***, 153 A.3d 332, 335-36 (Pa.Super. 2016) (recognizing "the many rights, benefits, and responsibilities [that] states confer on married couples[,]" including taxation, inheritance rights, spousal privilege, hospital access, workers' compensation benefits, health insurance, and child custody) (quoting ***Obergefell v. Hodges***, 135 S.Ct. 2584, 2601 (2015)).

exercised by the individual, but also rejects Defendants' contention that concepts of history and tradition dictate that same-sex marriage is excluded from the fundamental right to marry. The right Plaintiffs seek to exercise is not a new right, but is rather a right that these individuals have always been guaranteed by the United States Constitution. As aptly explained by the Supreme Court in **Lawrence** [**v. Texas**, 539 U.S. 558, 578-79 (2003)]:

> Had those who drew and ratified the Due Process Clauses of the Fifth Amendment or the Fourteenth Amendment known the components of liberty in its manifold possibilities, they might have been more specific. They did not presume to have this insight. They knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom.

**Id.** at 423. The district court held that "same-sex couples who seek to marry in Pennsylvania may do so, and already married same-sex couples will be recognized as such in the Commonwealth." **Id**. at 431. Therefore, the court declared both sections 1102 and 1704 of the Marriage Law unconstitutional and issued an order permanently enjoining their enforcement.[7] **Id.** at 431-32.

Subsequently, in **Obergefell v. Hodges**, 135 S.Ct. 2584 (2015), the United States Supreme Court declared that all state laws prohibiting marriage between same-sex partners are unconstitutional violations of the

---

[7] The Secretary of the Pennsylvania Department of Health, the defendant in **Whitewood**, did not appeal the district court's decision.

Due Process and Equal Protection Clauses of the Fourteenth Amendment. The Supreme Court held:

> It is now clear that the challenged laws burden the liberty of same-sex couples, and it must be further acknowledged that they abridge central precepts of equality. Here the marriage laws enforced by the respondents are in essence unequal: same-sex couples are denied all the benefits afforded to opposite-sex couples and are barred from exercising a fundamental right. . . .
>
> . . . [T]he right to marry is a fundamental right inherent in the liberty of the person, and under the Due Process and Equal Protection Clauses of the Fourteenth Amendment couples of the same[]sex may not be deprived of that right and that liberty. The Court now holds that same-sex couples may exercise the fundamental right to marry. No longer may this liberty be denied to them. . . . [T]he State laws challenged by Petitioners in these cases are now held invalid to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples.

*Id.* at 2604-05.

Accordingly, following **Whitewood** and **Obergefell**, same-sex couples in Pennsylvania can legally marry and must be afforded the same rights and protections as opposite-sex married couples, including inheritance rights and survivor benefits. **See Neyman**, 153 A.3d at 1018 (noting that "**Obergefell** cemented the fundamental right of same-sex couples to marry and prohibited any lack of recognition of such marriages based upon the relationships['] 'same-sex character'") (quoting **Obergefell**, 135 S.Ct. at 2607-08)).

Despite these clear pronouncements by the United States Supreme Court and the federal district court in Pennsylvania, the trial court in this

case concluded that it was bound by the unconstitutional provisions of the Marriage Law, finding that because "same-sex couples did not have the right to marry in Pennsylvania until May of 2014 . . . it was **never legal** for same-sex couples to enter into a common law marriage." 1925(a) Op. at 5 (emphasis added). Thus, the trial court concluded that "it was **legally impossible** for [Hunter and Carter] to enter into a common law marriage before common law marriages were abolished in Pennsylvania [in 2005]." *Id.* (emphasis added). We conclude that the trial court erred.

The premise of the trial court's analysis was that sections 1102 and 1704 of the Marriage Law, though now declared unconstitutional, were legally binding during the time that Carter and Hunter might otherwise have entered into a common law marriage. This premise misreads the fundamental import of *Windsor*, *Whitewood*, and *Obergefell*. As the *Whitewood* court observed: "The right Plaintiffs seek to exercise is not a new right, but is rather a right that these individuals have **always** been guaranteed by the United States Constitution." 992 F.Supp.2d at 423 (emphasis added); *accord Obergefell*, 135 S.Ct. at 2603 (observing "that new insights and societal understandings can reveal unjustified inequality within our most fundamental institutions that once passed unnoticed and unchallenged"). Sections 1102 and 1704 of the Marriage Law have been invalidated "to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples." *Obergefell*, 135 S.Ct. at 2605; *see Whitewood*, 992 F.Supp.2d at 431 (declaring that

"it is time to discard [sections 1102 and 1704 of the Marriage Law] into the ash heap of history" and that "already married same-sex couples will be recognized as such in the Commonwealth").

Together, **Windsor**, **Whitewood**, and **Obergefell** teach that same-sex couples have precisely the same capacity to enter marriage contracts as do opposite-sex couples, and a court today may not rely on the now-invalidated provisions of the Marriage Law to deny that constitutional reality. Consequently, because opposite-sex couples in Pennsylvania are permitted to establish, through a declaratory judgment action, the existence of a common law marriage prior to January 1, 2005, **see** 23 Pa.C.S. § 1103, same-sex couples must have that same right. To deprive Hunter of the opportunity to establish his rights as Carter's common law spouse, simply because he and Carter are a same-sex couple, would violate both the Equal Protection and Due Process Clauses of the Fourteenth Amendment.[8]

_____

[8] In the two years since **Obergefell** was decided, several Pennsylvania courts of common pleas have declared the validity of pre-2005 same-sex common law marriages. **See, e.g., In re Estate of Wilkerson**, No. 500 DE of 2016 (Phila. Cty. C.C.P. filed Sept. 25, 2016); **In re Estate of Howey**, No. 1515-2112 (Chester Cty. C.C.P. filed Aug. 23, 2016); **In re Estate of Brim**, No. 46-14-X4458 (Montgomery Cty. C.C.P. filed May 24, 2016); **In re R.M.D.**, No. 2016-000589 (Del. Cty. C.C.P. filed Mar. 21, 2016); **In re Estate of Underwood**, No. 2014-E0681-29 (Bucks Cty. C.C.P. filed July 29, 2015). **See also** Steven A. Young, Note, _Retroactive Recognition of Same-Sex Marriage for the Purposes of the Confidential Marital Communications Privilege_, 58 Wm. & Mary L. Rev. 319, 338-342 (2016) (discussing **Obergefell**'s application to the recognition of same-sex common law marriages). Federal courts have likewise applied **Obergefell** in determining the validity of same-sex marriages pre-dating the **Obergefell** decision. _(Footnote Continued Next Page)_

**Proving the Elements of Same-Sex Common Law Marriage**

Next, Hunter asserts that the trial court erred in concluding that even if a same-sex couple were permitted to establish the existence of a pre-2005 common law marriage, Hunter failed to prove a common law marriage under controlling Pennsylvania law. After careful review of the record and the trial court's opinion, we conclude that Hunter satisfied his burden of proving that he and Carter agreed in February 1997 "to enter into the legal relationship of marriage at the present time." ***Staudenmayer***, 714 A.2d at 1020.

Even before it was abolished in 2005, common law marriage was generally disfavored in Pennsylvania. As our Supreme Court explained: "Because claims for the existence of a marriage in the absence of a certified ceremonial marriage present a 'fruitful source of perjury and fraud,' Pennsylvania courts have long viewed such claims with hostility." ***Id.*** at 1019 (quoting ***In re Estate of Wagner***, 159 A.2d 495, 497 (Pa. 1960)). The perceived motivation for such perjury and fraud lies in the set of potential benefits of an after-the-fact recognition of a marriage not otherwise established by tangible proof such as a marriage certificate or formal wedding ceremony. ***See, e.g., In re Estate of Collings***, 175 A.2d 62, 63 (Pa. 1961) ("[T]he advocacy of a common law marriage is too often

*(Footnote Continued)* ─────────────

***See, e.g., Hard v. Attorney Gen.***, 648 Fed. Appx. 853 (11th Cir. 2016); ***Ranolls v. Dewling***, ___ F.Supp.3d ___, 2016 WL 7726597 (E.D. Tex. filed Sept. 22, 2016).

made . . . after one of the parties to the marriage has died and the survivor desires to share in the distribution of the deceased party's estate.").

As a result, the party seeking to establish the existence of a common law marriage has what has been described as "a heavy burden." **Estate of Gavula**, 417 A.2d 168, 171 (Pa. 1980). The precise contours of that burden, however, have not always been clear, in part because the understandable concern about unchecked perjury has been tempered by the recognition of the inherent difficulty in proving a relationship not accompanied by formal ceremony. Our Supreme Court's most recent guidance on this subject came in 1998:

> A common law marriage can only be created by an exchange of words in the present tense, spoken with the specific purpose that the legal relationship of husband and wife is created by that. Regarding this requirement for an exchange of words in the present tense, this Court has noted:
>
> > It is too often forgotten that a common law marriage is a marriage by the express agreement of the parties without ceremony, and almost invariably without a witness, by words – not in futuro or in postea, but – in praesenti, uttered with a view and for the purpose of establishing the relationship of husband and wife. The common law marriage contract does not require any specific form of words, and all that is essential is proof of an agreement to enter into the legal relationship of marriage at the present time.
>
> The burden to prove the marriage is on the party alleging a marriage, and we have described this as a "heavy" burden where there is an allegation of a common law marriage. When an attempt is made to establish a marriage without the usual formalities, the claim must be viewed with "great scrutiny."

- 15 -

> Generally, words in the present tense are required to prove common law marriage. Because common law marriage cases arose most frequently because of claims for a putative surviving spouse's share of an estate, however, we developed a rebuttable presumption in favor of a common law marriage where there is an absence of testimony regarding the exchange of *verba in praesenti*. When applicable, the party claiming a common law marriage who proves: (1) constant cohabitation; and, (2) a reputation of marriage "which is not partial or divided but is broad and general," raises the rebuttable presumption of marriage.

*Staudenmayer*, 714 A.2d at 1020-21 (internal citations and footnotes omitted). However, with respect to the presumption, the Supreme Court went on to state:

> [I]f a putative spouse is able to testify and fails to prove, by clear and convincing evidence, the establishment of the marriage contract through the exchange of *verba in praesenti*, then that party has not met its "heavy" burden to prove a common law marriage, since he or she does not enjoy any presumption based on evidence of constant cohabitation and reputation of marriage.

*Id.* at 1021.

The requirement of "words in the present tense" is designed to ensure the existence of a present intent to marry, like the present intent established in a formal wedding ceremony, rather than a plan to marry in the future or a claim to have wed in the past. With regard to this requirement, the Supreme Court explained that a "common law marriage contract does not require any specific form of words, and all that is essential is **proof of an agreement to enter into the legal relationship of marriage at the present time**." *Id.* at 1020 (emphasis added). Stated differently,

- 16 -

"common law marriage will still be recognized without use of *verba de praesenti*, where the intention of the parties[,] as expressed by their words, is that they were married." **Cann v. Cann**, 632 A.2d 322, 325 (Pa.Super. 1993). Furthermore, this Court has stated:

> It is unquestioned that our courts will give effect to the intention of the parties and find a valid marriage where no direct testimony is offered as to the precise words of the marriage contract. . . . It is true that the parties did not use the formal words of the marriage ceremony, nor was it necessary that they should do so, if each so understood the relation into which they were about to enter, and their words, fairly interpreted, show that they then and there mutually consented to it. . . . [M]arriage is a civil contract, which may be completed by any words in the present time without regard to form, the essential to its validity being the consent of parties able to contract. . . . [I]t is not the duty of the courts to seek for an interpretation of the words used by the parties which would be inconsistent with an honorable intention as well as with their subsequent conduct and declarations, when an interpretation consistent with the formation of an honorable relation is possible, and in the light of all the circumstances, more probably expresses their intention.

**Commonwealth ex rel. McDermott v. McDermott**, 345 A.2d 914, 917 (Pa.Super. 1975) (internal quotations and citations omitted).[9]

_____

[9] We acknowledge that in some cases, existing precedent does not make entirely clear whether a court determining if a common law marriage exists should apply the requirement of words of present intent or the rebuttable presumption based on cohabitation and reputation. In **Staudenmayer**, the Supreme Court stated that the presumption is inapplicable "where **both parties** are able to testify" regarding *verba in praesenti*. 714 A.2d at 1021 (emphasis added). However, other language in **Staudenmayer** suggests that the requirement of words of present intent also applies where only one party is available to testify. According to **Staudenmayer**, courts may rely on the presumption only in the absence of
*(Footnote Continued Next Page)*

Here, Hunter argues that the trial court erred in applying to this case the ordinary "hostility" directed at claims of common law marriage because the basis for such hostility – concern about fraudulent claims for pecuniary gain – are not present here. In support, he cites *Wagner*, 159 A.2d at 497, which concluded that in a case where the parties were formally married and then divorced, a later claim of common law "remarriage" should be favored rather than disfavored. *Wagner*, which was cited with approval in *Staudenmayer*, 714 A.2d at 1019, teaches that when assessing claims of common law marriage, context matters, and general notions of hostility need not always dictate the outcome.[10]

*(Footnote Continued)* _____

"direct testimony regarding the exchange of *verba in praesenti*." *Id.*; *see also id.* (rebuttable presumption applies "only in cases where other proof is not available") (internal quotation omitted); *id.* at 1022 ("rebuttable presumption applies only when testimony regarding the exchange of *verba in praesenti* is unavailable").

In this case, Hunter, the sole surviving putative spouse, was available to testify and did testify. (The trial court did not address whether the Dead Man's Act, 42 Pa.C.S. § 5930, should have precluded Hunter's testimony. *See infra* n.11.) Therefore, because Hunter offered direct testimony regarding the exchange of words, we agree with the trial court that the presumption did not apply. Nevertheless, Hunter's evidence of cohabitation and reputation may properly be considered as corroborating his and Carter's present intent to marry in 1997. *See, e.g., McDermott*, 345 A.2d at 919 (finding that parties had expressed present intent to resume their marriage and that "[t]heir subsequent cohabitation and holding out to others [was] corroborative of this intent").

[10] We do not accept the suggestion that same-sex couples should have a **lesser** burden in proving common law marriage than do opposite-sex couples. The lesson of *Windsor*, *Whitewood*, and *Obergefell*, as applied in this context, is that same-sex couples not only have the same right to

*(Footnote Continued Next Page)*

At the hearing, Hunter testified that on December 25, 1996, he proposed to Carter and gave him a diamond ring. N.T., 7/5/16, at 12. He asked, "Will you marry me?" to which Carter replied, "Yes." *Id.*[11] At this point, any reasonable reading of the facts would lead to the conclusion that Hunter and Carter were engaged to be married.

Two months later, on February 18, 1997, Carter completed the ring exchange by giving Hunter a ring in return. *Id.* at 12-13, 41. The ring bears the engraving, "February 18, 1997." *Id.* at 41. Each year thereafter, Hunter and Carter celebrated their anniversary on February 18. *Id.* at 41-42. Both of their families treated Hunter and Carter as spouses, with Carter's nieces referring to Hunter as "Uncle Mike." *Id.* at 23, 38-39. Hunter testified that he and Carter considered themselves married as of February 18, 1997 and referred to each other as spouses from that day forward. *Id.* at 41. Hunter also submitted affidavits from his brother, several friends, and Carter's sisters, each of whom stated that Hunter and

---
*(Footnote Continued)* ─────────────

prove a common law marriage as do opposite-sex couples, but also the same burden of proof. As noted above, however, the precise contours of that burden vary with context.

[11] The Dead Man's Act, had it been raised, likely would not have precluded Hunter's testimony regarding his exchange of words with Carter because Hunter's interest, as the executor of Carter's estate, was not adverse to that of Carter, the deceased party to the putative contract. *See **Punxsutawney Mun. Airport Auth. v. Lellock**, 745 A.2d 666, 670 (Pa.Super. 2000) (for Dead Man's Act to apply, "the interest of the proposed witness [must] be adverse to the interest of the decedent's estate").

Carter had considered themselves married and held themselves out as a married couple. ***See*** Decl. Judg. Compl. & Pet. for Declaration, Exs. A-F.

Thus, the uncontradicted evidence established that Hunter and Carter had a present intent to marry on February 18, 1997. As prior cases have recognized, the exchange of rings is particularly strong evidence of such an intent. ***See, e.g., Wagner***, 159 A.2d at 498 (noting that "[a] wedding ring signifies that the one who presents and the one who receives are wedded") (quoting ***Caddy v. Johnstown Firemen's Relief Ass'n***, 196 A. 590, 592 (Pa.Super. 1938)); ***In re Rosenberger's Estate***, 65 A.2d 377, 379 (Pa. 1949) (upholding common law marriage where evidence showed decedent placed wedding ring on putative spouse's finger, promised to marry her before birth of their child, and she assented). Moreover, unlike the many cases in which the declaration of common law marriage is sought for use as a sword against competing claims to an estate, ***see, e.g., Collings***, 175 A.2d at 63, Hunter's petition not only was uncontested but indeed was supported by Carter's family. Nothing about the facts of this case suggests that it is "a fruitful source for perjury or fraud." ***Wagner***, 159 A.2d at 497.

That Hunter and Carter had the present intent to marry is further corroborated by their conduct after February 18, 1997. ***See Staudenmayer***, 714 A.2d at 1021 (stating that party attempting to prove common law marriage "may introduce evidence of constant cohabitation and reputation of marriage in support of his or her claim"). After their exchange of rings, both men considered themselves married to each other, held

themselves out to others as a married couple, and lived together as such for more than 16 years. They purchased homes together, prepared and executed mutual wills, supported each other financially, and held joint banking and investment accounts. They also celebrated their anniversary on February 18 every year until Carter's death.

In sum, the evidence clearly established that Hunter and Carter, like countless loving couples before them, expressed "an agreement to enter into the legal relationship of marriage at the present time." *Id.* at 1020; *see* *Cann*, 632 A.2d at 325. Therefore, we conclude that Hunter proved, by clear and convincing evidence, that he and Carter had entered into a common law marriage on February 18, 1997.

The trial court's contrary conclusion – that Hunter had failed to prove a present intent to marry – was based in part on testimony about the couple's future plans to have a formal wedding ceremony. *See* 1925(a) Op. at 5-7. For example, when asked about a formal marriage ceremony, Hunter testified that he and Carter had planned "to throw a big party as soon as [same-sex marriage became] legal in Pennsylvania." N.T., 7/5/16, at 29-30; *see* 1925(a) Op. at 5-6. Carter's sister testified that Hunter and Carter were "planning a wedding" but that they "hadn't set a date" before Carter's death. N.T., 7/5/16, at 38; *see* 1925(a) Op. at 6. Similarly, Keith Zatezalo-Greene, a long-time friend of the couple, testified that when he asked Carter why he and Hunter had not married in another state where same-sex marriage was legal, Carter stated that "they didn't want to go get that piece

of paper until [same-sex marriage] was recognized in the Commonwealth of Pennsylvania." N.T., 7/5/16, at 44-45; *see* 1925(a) Op. at 6.

The flaw in the trial court's reliance on this evidence, however, is that the couple's statements about a future "wedding" or "big party" plainly referred to a **ceremonial** marriage, which they concededly had not yet undertaken and which is fully consistent with an existing common law marriage. Hunter and his witnesses testified without contradiction that the couple wanted to have a formal marriage ceremony as soon as same-sex marriage was recognized as legal in Pennsylvania. For example, after Zatezalo-Greene testified about the lack of a formal ceremony in a different state, he explained that "[f]or all rights and purposes, they considered themselves a married couple, and [they said] that they wanted **the formal aspect of it** when it was recognized where we lived." N.T., 7/5/16, at 45 (emphasis added).

That Hunter and Carter had discussed having a formal wedding ceremony at a later time does not undermine, or in any way affect, the clear and convincing evidence of their present intent to marry in February 1997. Our Supreme Court reached the same conclusion with respect to an opposite-sex couple in **Blecher's Estate**, 112 A.2d 129 (Pa. 1955). In that case, the Court rejected an estate's assertion that a widow claiming a common law marriage to the decedent had proven only an intent to marry in the future, where the couple's "statements relative to [their] intention to

marry related solely to a *ceremonial* marriage." ***Id.*** at 130-31 (emphasis in original).

Accordingly, because we conclude that Hunter satisfied his burden of proving that he and Carter had entered into a common law marriage before January 1, 2005, the trial court erred in denying his petition.

Order reversed. Case remanded to the trial court for the entry of an order declaring the existence of a common law marriage between Hunter and Carter as of February 18, 1997. Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  4/17/2017