J-A04041-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| JOHN DUGAN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSEPH A. GRECO | : | No. 1924 EDA 2019 |

Appeal from the Order Entered June 6, 2019
In the Court of Common Pleas of Chester County Civil Division at No(s):
2019-00302-DI

BEFORE: PANELLA, P.J., STRASSBURGER, J.[*], and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED MARCH 09, 2020**

John Dugan appeals from the order (i) granting Joseph A. Greco's petition for declaratory relief that Greco and Dugan had not entered into a common law marriage prior to its abolition by the Pennsylvania legislature in 2005[1] and (ii) dismissing Dugan's complaint seeking a divorce from Greco. We affirm.

We adopt the trial court's accurate description of the factual background of this case:

> [Dugan] and [Greco] testified that they met online and had their first date May 16, 1998. They lived together from November 1998 to March 2018. The relationship ended in June 2018. [Dugan] is currently a manager of a retail store. He previously worked at a

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 23 Pa.C.S. § 1103, as amended by Act of Nov. 23, 2004, P.L. 954, No. 144.

medical research facility. [Greco] is a medical doctor affiliated with a local hospital and medical system.

In August 1998, [Dugan] and [Greco] vacationed together in Cancun, Mexico. While shopping at a flea market, [Dugan] purchased a silver ring for himself. [Greco] admired it and then bought himself a similar one the same day. Both rings have a braided design, but they are not identical. The parties wore the rings on their respective right hands. The evening after purchasing the rings, they had dinner and returned to their hotel room. Their respective recollections as to events that evening differ slightly, but they did not exchange rings nor discuss marriage. In fact, neither has any recollection of what they may have discussed. During that trip to Mexico they did not have a marriage or commitment ceremony, nor did they at any later time.

[Greco] testified the rings purchased in Mexico were not a symbol of a marriage. When he looked at his ring it was to remind him of [Dugan], not that they were married[.] (N.T.[,] 4/1/19, at 42). [Dugan] testified that his ring was a symbol of togetherness. "It was braided so we were intertwined." ([*Id.*] at 71). He put the ring on his right hand. "I remember saying we'll put them on our right hand because we are not – we're different, we are not recognized by this, you know, by the state or by law as, you know, same sex couples at that point. And, yes, we were not married, but we were different, and I said we'll put it on that hand because we are different and that lets everybody know we are different." ([*Id.*]).

In November of 1998, [Dugan] moved to [Greco's] house in King of Prussia, Pennsylvania. Each year they celebrated their anniversary on May 16 – the date of their first meeting. [Dugan] stated that the parties always celebrated the day they met, May 16 "[b]ecause we weren't married legally. I mean, I always felt like we were a couple, we were together, we were a partnership. Marriage is a certificate." ([*Id.*] at 75). "Because we were not recognized and we were different. You know, we had a partnership. We had a commitment to each other. And we weren't like a quote, unquote, heterosexual couple." ([*Id.*] at 76).

In 1999, they purchased property in Phoenixville, Pennsylvania. They hired an architect and built a house on the property ("2 Fox Run"), and moved in around 2000-2001[.] ([*Id.*] at 50). [Dugan] testified that [Greco] paid for the house although he did contribute

to the cost with money from his 401k[.] ([*Id.*] at 85). [Dugan] was not a co-borrower on the mortgage because he had bad credit.

[Greco] purchased vehicles for the couple. Both of their names are on the title for a Ford F-150. They also owned a Chevy. ([*Id.*] at 108-110, Exhibits P-15, P-16). Both are listed on each other's car insurance. [Greco] testified: "I've helped [Dugan] purchase a vehicle and my name had to be on it because he couldn't afford it on his own. . . I continued to repeatedly help [Dugan] out financially because he needed help and I paid for the insurance." ([*Id.*] at 46).

When the parties were together 15 years (2013), [Greco] purchased rings for both of them from Tiffany & Company. The rings are inscribed with their initials and the date that they met (5/16) with the symbol for "infinity" engraved after the date. They wore the rings on their respective right hands.

In 2014, the parties purchased property for [Greco's] parents located at 122 Potters Pond Drive, Phoenixville. On the deed, [Dugan] and [Greco], as grantees, took title in "tenancy with the right of survivorship[.]" ([Exhibit] D-1 ). [Greco] testified that "we combined the incomes." ([*Id.*] at 20). Around this time, [Greco] acquired the house next to 2 Fox Run ("1 Fox Run"). The house had been owned by an elderly couple whom [Greco] (a physician) treated at their house until their deaths. ([*Id.*] at 123). [Greco] is the sole titled owner of 2 Fox Run and 1 Fox Run.

In 2015, [Dugan] experienced significant work-related stress. In addition he lost several of family members, most notably, his mother. After his mother's death, [Dugan] helped to draft her obituary. In it, each of his sisters-in-law were identified as "wife of" the brother to whom she was married. [Greco] was named after [Dugan], but no relationship was identified. (N.T., at 116).

[Greco] encouraged [Dugan] to quit his job at the research facility, which he did. When [Dugan] did not obtain COBRA health insurance, [Greco] designated [Dugan] as his domestic partner for health insurance with [Greco's] employer. [Greco] testified that if the parties were married [which had become legal by that date], he would have produced a marriage certificate to designate [Dugan] as his spouse to receive the insurance benefits. Since they weren't married, [Greco] had to show that they lived together and were domestic partners. As part of the documentation needed to show their domestic partnership,

[Greco] added [Dugan's] name to a savings account[.] ([***Id.***] at 50, 111-112[; Exhibit] P-17). [Dugan] was on [Greco's] health insurance from January 2016 to January 2019[.] ([***Id.***] at 114).

The parties did not participate in a commitment or marriage ceremony, either before or after the legalization of same-sex unions [in Pennsylvania]. [Greco] testified that he wanted to get married. He had several discussions with [Dugan] about getting married (before and after [legalization]*),* but [Dugan] did not want to be married[.] ([***Id.***] at 28-29). [Dugan] stated: "I didn't feel that we needed a certificate because we had been married – we had been living together as a married couple. We had been – you know, it was a partnership. We were committed. We were definitely on a rocky road, but I didn't think that a certificate was going to help us in any way. . . So having a certificate of marriage, I didn't see how it was going to fix it. Yes, it would have given us more rights under the law, but how was that going to fix it?" ([***Id.***] at 120-121). When asked if [Greco] had ever said to him that they didn't need to get married because they already were, [Greco] testified that [Dugan] never expressed such sentiments to him. "Man, if he had said that I would have had a whole different conversation and I would have been a – I mean – no he didn't. . . .That seemed to be a logical thing you would say if you thought you didn't need to be married because you were married, you'd say it at that time[."] ([***Id.***] at 29).

The parties separated in June 2018[.]

Trial Court Opinion at 1-5 (footnote omitted)

Dugan filed the divorce complaint on January 9, 2019. On January 29, 2019, Greco filed the petition for declaratory judgment. Hearings were conducted by the trial court on April 1 and 11, 2019. On June 6, 2019, the trial court filed an order granting Greco's petition for declaratory relief and

dismissing Dugan's divorce complaint along with a supporting opinion.  Dugan

filed a timely notice of appeal of the trial court's order.[2]

Dugan presents the following issues for our review:

1. Whether the trial court committed an error of law by applying a rigid application of the law and by failing to examine all evidence under the retrospective lens of the unconstitutional and hostile laws in effect at the time of Mr. Dugan and Dr. Greco's marriage?

2. Whether the trial court committed an error of law by failing to find that John Dugan met the requirements for establishing a common law marriage prior to 2005 in Cancun, Mexico in August 1998?

3. Whether the trial court erred by requiring direct testimony as to the precise words of the marriage contract, contrary to legal precedent and without giving proper weight to overwhelming evidence consistent with the honorable intentions of the parties?

   a. Whether the Trial Court Erred by Applying an Arbitrary Standard and Requiring the Use of Words Such as "Spouse" and "Husband" in Order to Establish "Reputation of Marriage" in 1998 When Marriage was Illegal for Same-Sex Couples?

   b. Whether the trial court erred in failing to consider the circumstances of the unconstitutional laws existing at the time of the creation of Mr. Dugan and Dr. Greco's marriage (1998) when examining and weighing the evidence of cohabitation and reputation of marriage?

4. Whether the trial court committed an error of law by opining that Mr. Dugan and Dr. Greco's identification as "domestic partners" on a policy of insurance precluded their meeting the legal requirements of establishing a common law marriage?

---

[2] Dugan filed his statements of errors complained of on appeal on July 30, 2019.  On August 26, 2019, the trial court entered a statement in lieu of opinion, in which it indicated that it was relying on the reasons stated in its June 6, 2019 opinion.

5. Whether the trial court committed an error of law by allowing testimony, over objection, of the parties failing to obtain a marriage certificate or engage in a marriage ceremony following the legalization of same sex marriage when the same standard would be inapplicable to heterosexual couples whom always had the opportunity to obtain a marriage certificate and/or participate in a marriage ceremony?

Dugan's Brief at 4-8 (trial court answers and suggested answers omitted).

"The proper procedure for obtaining legal recognition of a common law marriage is the filing of a declaratory judgment action." *In re Estate of Carter*, 159 A.3d 970, 974 (Pa. Super. 2017); *see also* 23 Pa.C.S. § 3306.[3] Our standard of review in a declaratory judgment action is

limited to determining whether the trial court clearly abused its discretion or committed an error of law. If the trial court's determination is supported by the record, we may not substitute our own judgment for that of the trial court. The application of the law, however, is always subject to our review.

*Estate of Carter*, 159 A.3d at 974 (citation omitted).

Dugan first argues that the trial court erred by applying the law in Pennsylvania relating to common law marriage to Dugan and Greco without taking into account that same-sex marriage was illegal for the large majority

---

[3] Section 3306 of the Divorce Code provides that:

When the validity of a marriage is denied or doubted, either or both of the parties to the marriage may bring an action for a declaratory judgment seeking a declaration of the validity or invalidity of the marriage and, upon proof of the validity or invalidity of the marriage, the marriage shall be declared valid or invalid by decree of the court and, unless reversed upon appeal, the declaration shall be conclusive upon all persons concerned.

23 Pa.C.S. § 3306.

of their relationship. Dugan states that he "is not asking for the law to apply differently to him," but rather that the trial court should have, but failed to, "account for the inherent differences between heterosexual couples and same-sex couples and acknowledge the legal hostility same-sex couples faced" prior to the legalization of same-sex marriage. Dugan's Brief at 33. Thus, Dugan asserts that the trial court erred by requiring proof that the couple used terms like "husband," "spouse," and "marriage" when referring to their union or partnership, rather than the term they did employ, "forever partners." *Id.* at 32-33.

Pennsylvania has historically recognized two types of marriage, ceremonial and common law. *Staudenmayer v. Staudenmayer*, 714 A.2d 1016, 1019 (Pa. 1998); *Estate of Carter*, 159 A.3d at 974. "A ceremonial marriage is a wedding or marriage performed by a religious or civil authority with the usual or customary ceremony or formalities." *Staudenmayer*, 714 A.2d at 1019. A common law marriage, by contrast, "can only be created by an exchange of words in the present tense, spoken with the specific purpose" of establishing a marital relationship. *Id.* at 1020; *see also In re Estate of Tito*, 150 A.3d 464, 468 (Pa. Super. 2016). In 2004, the General Assembly amended the Domestic Relations Code abolishing common law marriage, but the legislature provided that common law marriages lawfully entered into on or before January 1, 2005 would continue to be recognized. *See* 23 Pa.C.S. § 1103; *Estate of Carter*, 159 A.3d at 974 & n.1.

"Even before it was abolished in 2005, common law marriage was generally disfavored in Pennsylvania," and a party alleging the existence of a common law marriage bears a "heavy" burden. **Staudenmayer**, 714 A.2d at 1020 (citation omitted); **Estate of Carter**, 159 A.3d at 978. There are two ways in which a party can prove the existence of a common law marriage. Generally, the party alleging the common law marriage must show by clear and convincing evidence that the couple came to an "express agreement" – or *verba in praesenti* – "uttered with a view and for the purpose of establishing" the marital relationship. **Staudenmayer**, 714 A.2d at 1020-21 (citation omitted). Pennsylvania law also provides for a rebuttable presumption of a common law marriage that may be raised where the proponent of the marriage demonstrates (i) constant cohabitation by the parties and (ii) a reputation of marriage "which is not partial or divided but is broad and general." **Staudenmayer**, 714 A.2d at 1020-21 (citation omitted); **see also Estate of Carter**, 159 A.3d at 979. However, this rebuttable presumption is "is one of necessity to be applied only in cases . . . [where there is an] inability to present direct testimony regarding the exchange of *verba in praesenti*." **Staudenmayer**, 714 A.2d at 1021 (citation omitted).

When Dugan and Greco began dating in 1998, Pennsylvania law did not recognize same-sex marriages. **See generally Estate of Carter**, 159 A.3d at 975-77 (describing history of Pennsylvania marriage laws as it pertains to same-sex couples). In fact, following the enactment of the federal Defense of Marriage Act in 1996, the General Assembly amended the Marriage Law that

same year to define marriage as a "civil contract by which one man and one woman take each other for husband and wife" and providing that "[a] marriage between persons of the same sex which was entered into in another state or foreign jurisdiction, even if valid where entered into, shall be void in" Pennsylvania. 23 Pa.C.S. §§ 1102, 1704; *see also Estate of Carter*, 159 A.3d at 975. In 2013, however, the United States Supreme Court's decision in *United States v. Windsor*, 570 U.S. 744 (2013), set off a "tectonic shift in the law regarding same-sex marriage." *Estate of Carter*, 159 A.3d at 975 (citation omitted). In *Windsor*, the High Court struck down the Defense of Marriage Act as violating "basic due process and equal protection principles applicable to the Federal Government" through the Fifth Amendment of the United States Constitution. 570 U.S. at 769. The following year, in *Whitewood v. Wolf*, 992 F.Supp.2d 410 (M.D. Pa. 2014), the United States District Court for the Middle District of Pennsylvania ruled that Pennsylvania's restriction on marriage to opposite-sex partners was unconstitutional under the due process and equal protection clauses of the Fourteenth Amendment. *Id.* at 421-31. The District Court held that "same-sex couples who seek to marry in Pennsylvania may do so, and already married same-sex couples will be recognized as such in the Commonwealth." *Id.* at 431. Finally, in 2015, the U.S. Supreme Court issued *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015), which struck down **all** state laws restricting marriage to opposite-sex partners as violative of the "fundament right to marry" embodied in the Fourteenth Amendment. *Id.* at 2604-05.

In **Estate of Carter**, this Court addressed for the first time after **Obergefell** the right of same-sex couple to form a common law marriage. In that case, two men, Michael Hunter and Stephen Carter, met in February 1996 and ten months later, Hunter asked Carter to marry him and gave him a ring. 159 A.3d at 972. Carter agreed, and two months later, Carter gave Hunter a ring. **Id.** The couple celebrated the date of the second ring exchange for the next 16 years until Carter's sudden death in 2013. **Id.** at 972-73. Hunter filed an unopposed petition seeking a declaration of a common law marriage, which the trial court denied, reasoning that it was legally impossible for same-sex couples to enter into a common law marriage before common law marriage was abolished by the legislature in 2005. **Id.** at 973. On appeal to this Court, we reversed. We observed that "**Windsor**, **Whitewood**, and **Obergefell** teach that same-sex couples have precisely the same capacity to enter marriage contracts as do opposite-sex couples, and a court today may not rely on the now-invalidated provisions of the Marriage Law to deny that constitutional reality." **Id.** at 977. Thus, we held that "because opposite-sex couples in Pennsylvania are permitted to establish, through a declaratory judgment action, the existence of a common law marriage prior to January 1, 2005, same-sex couples must have that same right." **Id.** at 977-78 (internal citation omitted).

We explained in **Estate of Carter** that the long-standing precedent establishes that a "common law marriage contract does not require any specific form of words" and that there is no requirement that there be direct

testimony of the "precise words of the marriage contract." *Id.* at 979 (citations omitted); *see also Staudenmayer*, 714 A.2d at 1020. Furthermore, we noted that "context matters" in addressing the evidence that is required to prove that a common law marriage was formed. *Estate of Carter*, 159 A.3d at 980. However, while we noted the lack of formality in the creation of a common law marriages, we did not hold in *Estate of Carter* that a different standard or burden of proof applies to same-sex couples but instead that same-sex couples can enjoy the right to marry "on the same terms and conditions as opposite-sex couples." *Id.* at 977 (quoting *Obergefell*, 135 S.Ct. at 2605). Rather, we explicitly rejected the argument "that same-sex couples should have a **lesser** burden in proving common law marriage than do opposite-sex couples." *Id.* at 980 n.10 (emphasis in original). As we explained, "[t]he lesson of *Windsor*, *Whitewood*, and *Obergefell*, as applied in this context, is that same-sex couples not only have the same right to prove a common law marriage as do opposite-sex couples, but also the same burden of proof." *Id.*

Thus, same-sex couples have "precisely the same capacity" in Pennsylvania to enter into a common law marriage as opposite-sex couples. *Id.* at 977. In other words, they must prove that they formed a common law marriage on or before January 1, 2005, the date that the legislature abolished common law marriage for all Pennsylvanians, regardless of their sexual orientation. 23 Pa.C.S. § 1103; *Estate of Carter*, 159 A.3d at 974-75. Testimony is not required as to the precise words used, nor is there a

- 11 -

requirement that the putative married couple uttered specific words, such as "husband" or "spouse," or a formal declaration of marriage. **Staudenmayer**, 714 A.2d at 1020; **Estate of Carter**, 159 A.3d at 979. Moreover, "context matters" in common law marriage cases, and therefore a court may not discount that a party alleging that a same-sex common law marriage was formed on or before January 1, 2005 would not have had that right to have that union recognized as legal at that time. **Estate of Carter**, 159 A.3d at 980. Nevertheless, we reject any insinuation that the recognition of the equal right among same-sex couples to marry as recognized in **Windsor** and **Obergefell** and extended by **Estate of Carter** to common law marriage in this state afforded any favored status under the law to same-sex partners asserting a common law marriage compared to their opposite-sex peers. Indeed, to afford same-sex couples with a preferred status with respect to common law marriages would enact the same equal protection violation that **Windsor** and **Obergefell** sought to address.

With this recitation of the legal landscape in mind, we turn to Dugan's challenge to the merits of the trial court's decision. Dugan first argues that the trial court erred by not finding that a common law marriage was established in August 1998 when Dugan and Greco each purchased braided silver rings for themselves and each subsequently wore their rings on their right hands. Dugan argues that the purchase of these rings established their present intent to form a union as a "forever partnership," which continued over the next 20 years. Dugan's Brief at 25.

In its opinion, the trial court found that there was no evidence of an exchange of words between Dugan and Greco expressing a present intent to form a common law marriage during their Cancun trip in August 1998 or at any other point prior to the abolition of common law marriage on January 1, 2005. Trial Court Opinion at 7, 9-10, 13-14. As the trial court explained, neither Dugan nor Greco offered testimony that, after they purchased the rings, they had any discussion regarding a present intent to marry or the meaning of each wearing the rings. *Id.* at 7 ("[Dugan's and Greco's] testimony as to words of present intent was not contradictory; it was consistent in that it was non-existent."). In the absence of evidence of a present intent to form a common law marriage prior to 2005, the trial court concluded that Dugan had not met the "heavy" burden of showing the existence of a common law marriage by clear and convincing evidence. *Id.* at 9-10, 13-14 (citing *Staudenmayer*, 714 A.2d at 1020-21).

Upon review, we conclude that there was substantial evidence to support the trial court's conclusion that no words were exchanged regarding a present intent to marry, and, as such, there was no mutual consent to form such a union. Both Dugan and Greco testified as to their respective purchase of silver rings during their August 1998 vacation in Mexico and wearing those rings on their right hands as a symbol of their relationship. N.T., 4/1/19, at 27-28, 42, 44, 65, 78. However, neither Dugan nor Greco testified regarding any conversation that occurred at the time regarding an intent to marry. Dugan testified that they each purchased their own rings, took a photograph

- 13 -

of their hands with the rings on, and listened to music at their hotel room that night, but he stated on several occasions that he did not recall discussing with Greco the meaning of the purchase of the rings. *Id.* at 64-71, 125, 129. Dugan testified that he told Greco that they would wear their rings on their right hands because they were "different" and it would symbolize that they could not legally form a union at that time, but he did not testify whether Greco responded in any way to these statements. *Id.* at 71. Greco testified that the pair did not put the rings on the other's finger and they did not celebrate the purchase of the rings as a symbol of their marriage. *Id.* at 40-42.

Dugan further argues that the trial court erred by requiring testimony of specific words exchanged during their August 1998 vacation when their purchase of rings very clearly provides evidence of their formation of a marital relationship. As evidence that the couple formed a common law marriage during their August 1998 vacation by buying similar rings, Dugan cites to the testimony of a coworker and friend of Greco that after he returned from the Mexico trip she saw a ring on his hand and Greco told her "[w]e did it" and that they had "exchanged rings." *Id.* at 135. The friend explained that she "figured" that Greco's comment meant that "they had gotten married." *Id.* at 136. Dugan also notes his testimony regarding a conversation with Greco's mother at Thanksgiving dinner in 1998 where she saw the couple's rings, asked "does this mean what I think it does?," and Greco responded "yes." *Id.* at 78, 80.

- 14 -

While it is true that no formal set of words must be exchanged between common law spouses and "the exchange of rings is [seen by courts as] particularly strong evidence of" the intent to marry, *see Estate of Carter*, 159 A.3d at 979, 981, our Supreme Court has unambiguously held that a common law marriage "can only be created by an exchange of words in the present tense" expressing the intent to marry. *Staudenmayer*, 714 A.2d at 1020. *Estate of Carter* did not alter this requirement. Rather, as we explained in that case, "[t]he requirement of 'words in the present tense' is designed to ensure the existence of a present intent to marry, like the present intent established in a formal wedding ceremony, rather than a plan to marry in the future or a claim to have wed in the past." *Estate of Carter*, 159 A.3d at 979. What is essential is "proof of an agreement to enter into the legal relationship of marriage at the present time" so long as each party to the marriage contract "so understood the relation into which they were about to enter, and their words, fairly interpreted, show that they then and there mutually consented to it." *Id.* at 979-80 (citations and emphasis omitted); *see also Estate of Tito*, 150 A.3d at 469.

As the trial court recognized, the record in this case is devoid of evidence regarding a conversation prior to January 1, 2005 where the parties exchanged words indicating a present intent to marry. Furthermore, while it is clear that Dugan and Greco attached significance to the wearing of their rings, this evidence falls short of showing that they had a present intent to **marry** in August 1998 and is equally consistent with a decision by Dugan and

Greco to be in an exclusive relationship or to be engaged to be married at some point in the future. Unlike in **Estate of Carter**, the couple did not "exchange" rings but rather each bought their own similar, but not identical, ring. Moreover, Dugan and Greco celebrated May 16th, their first date, as their anniversary in the following years, rather than the date of the purchase of the rings during their Mexico vacation. **Compare Estate of Carter**, 159 A.3d at 972-73, 981 (holding that Carter's proposal with a ring, Hunter's completion of the ring exchange two months later, and the parties' celebration of the date of the presentation of the second ring as their anniversary corroborated the testimony of an exchange of words showing a present intent to marry). Accordingly, the trial court properly ruled that Dugan did not meet his "heavy" burden of establishing an exchange of words establishing a present intent to marry on or before January 1, 2005. **Staudenmayer**, 714 A.2d at 1020.

Dugan presents several additional arguments in this appeal related to the couple's reputation for marriage and cohabitation. First, he argues that, because both parties to the putative marriage provided contradictory testimony, the court should have found that a common law marriage existed based upon their reputation for marriage and constant cohabitation during their 20-year relationship. Dugan also contends that, when the trial court addressed his argument that he and Greco had a reputation as a married couple, the court improperly cited to the facts that the couple did not use the terms "husband" and "spouse" to refer to each other and that Greco named

Dugan as his "domestic partner" rather than his "spouse" on a health insurance form in 2015. *See* Trial Court Opinion at 8, 10. Finally, Dugan contends that the trial court erred by allowing testimony at the hearing regarding whether Dugan and Greco considered entering into a ceremonial marriage after the legalization of same-sex marriage.

These arguments misapprehend the legal standard for establishing a common law marriage. As stated above, Pennsylvania law allows for a rebuttable presumption in favor of a common law marriage in cases where there is constant cohabitation by the parties and a reputation for marriage. *Staudenmayer*, 714 A.2d at 1020-21 (citation omitted); *see also Carter*, 159 A.3d at 979. However, that rebuttable presumption is only applicable where the parties to the putative marriage are unavailable to testify regarding the exchange of words expressing their present intent to marry.[4] *Staudenmayer*, 714 A.2d at 1021; *Estate of Carter*, 159 A.3d at 980 n.9; *Perrotti v. Meredith*, 868 A.2d 1240, 1244-45 (Pa. Super. 2005). Thus, our Supreme Court has explained that

> if a putative spouse who is able to testify and fails to prove, by clear and convincing evidence, the establishment of the marriage contract through the exchange of *verba in praesenti,* then that party has not met its "heavy" burden to prove a common law

---

[4] The rebuttable presumption most often applies in cases where one of the parties to the putative marriage is deceased and the other party seeks the surviving spouse's share of the deceased's estate, but the Dead Man's Act, 42 Pa.C.S. § 5930, prohibits the surviving party from testifying regarding the agreement to marry. *Staudenmayer*, 714 A.2d at 1021.

marriage, since he or she does not enjoy any presumption based on evidence of constant cohabitation and reputation of marriage.

**Staudenmayer**, 714 A.2d at 1021.

In the present case, both Dugan and Greco are living and each offered testimony on the issue of whether they exchanged words in the present tense expressing an intent to marry prior to January 1, 2005. Therefore, the evidence Dugan offered to show that the couple cohabitated and had a reputation of marriage throughout their 20-year relationship cannot satisfy his burden of proof to establish a common law marriage. **Staudenmayer**, 714 A.2d at 1021; **Estate of Carter**, 159 A.3d at 980 n.9 (where surviving spouse testifies regarding the exchange of words, the rebuttable presumption is inapplicable); **Perrotti**, 868 A.2d at 1244 (where both parties to putative common law marriage testify yet neither party asserts that an exchange of words occurred, the proponent of the marriage could not "rehabilitate her failure to prove *verba in praesenti*, no matter how weighty or compelling that evidence" may have been (citation omitted)).

Accordingly, the trial court did not abuse its discretion or commit an error of law in determining that Dugan and Greco did not form a common law marriage on or before January 1, 2005. As such, Dugan is entitled to no relief on appeal.

Order affirmed.

Judge Strassburger files a concurring memorandum.

Judge Colins joins the concurring memorandum.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 3/9/2020*